COPY

1   Joshua D. Wayser (SBN 152711)
2   KATTEN MUCHIN ROSENMAN LLP
    2029 Century Park East, Suite 2600
3   Los Angeles, CA 90067-3012
    Telephone:   310.788.4400
4   Facsimile:   310.788.4471

5   Attorneys for Federal Deposit Insurance Corporation,
    as receiver for Vineyard Bank, National Association
6

FILED
CLERK, U.S. DISTRICT COURT

FEB 22 2011

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

7            UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
8               LOS ANGELES DIVISION

| | |
|---|---|
| 9   In re )<br>10   VINEYARD NATIONAL BANCORP, )<br>11   Debtor. )<br>12   _____ )<br>13   BRADLEY D. SHARP, AS LIQUIDATING )<br>14   TRUSTEE OF THE LIQUIDATING TRUST )<br>     OF VINEYARD NATIONAL BANCORP, )<br>15<br>16   Plaintiff and Counter-Defendant, )<br>17   v. )<br>18   FEDERAL DEPOSIT INSURANCE )<br>19   CORPORATION, in its capacity as )<br>     receiver for Vineyard Bank, National )<br>20   Association, )<br>21   Defendant and Counter-Plaintiff. )<br>22   _____ )<br>23<br>24<br>25<br>26<br>27<br>28 | District Court Case No.<br>**CV11-01563R**<br><br>Underlying Cases:<br><br>Chapter 11<br>Case No. 2:10-BK-21661-RN<br>Hon. Richard Neiter<br><br>Adv. Pro. No. 2:10-ap-01815-RN<br><br>**MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR VINEYARD BANK, NATIONAL ASSOCIATION, FOR THE ENTRY OF AN ORDER, PURSUANT TO 28 U.S.C. § 157(D), BANKRUPTCY RULE 5011(A), AND LOCAL DISTRICT COURT RULE 6.1 WITHDRAWING THE REFERENCE OF ADVERSARY PROCEEDING AND MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>Hearing<br>TBD<br><br>Date: March 21, 2011<br>Time: 10:00 A.M.<br>Courtroom: 8 |

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that as soon as counsel may be heard in either the Roybal Federal Building (255 East Temple Street, Los Angeles, CA 90012) or the Spring Street Courthouse (312 North Spring Street, Los Angeles, CA 90012), Federal Deposit Insurance Corporation ("FDIC"), as Receiver for Vineyard Bank, National Association ("FDIC–R"), by and through its undersigned counsel, shall request the relief sought in this Motion for Entry of an Order Pursuant to 28 U.S.C. § 157(d), Federal Rule of Bankruptcy Procedure 5011(a) and Local District Court Rule 6.1, Withdrawing the Reference of Adversary Proceeding No. 2:10-ap-01815 (this "Motion") captioned *Bradley D. Sharp, as liquidating trustee of the liquidating trust of Vineyard National Bancorp v. Federal Deposit Insurance Corporation, in its capacity as Receiver for Vineyard Bank, National Association* (the "Adversary Proceeding").[1]

This Motion is brought pursuant to 28 U.S.C. § 157(d) on the grounds that withdrawal of the reference of the Adversary Proceeding is mandatory because the Adversary Proceeding presents significant issues of federal non-bankruptcy law, including banking supervision laws under title 12 of the United States Code ("Title 12"), codified in the Federal Deposit Insurance Act ("FDIA") at 12 U.S.C. § 1811 *et seq.* and as amended by the Federal Deposit Insurance Corporation Improvement Act ("FDICIA"); the Financial Institutions Reform and Recovery Act ("FIRREA"), codified at 12 U.S.C. § 1819 *et seq.*; the corollary regulations interpreting the banking laws under title 12 of the

---

[1] The submission of this Motion shall not in any way constitute a submission by FDIC–R to the jurisdiction or authority of any court for the resolution of any regulatory matter involving VNBC and FDIC–R, nor is this Motion an admission that any court is the appropriate forum for disputes between FDIC–R and VNBC. The filing of this Motion shall not constitute a waiver or consent by FDIC–R of any: (a) right to Sovereign Immunity, whether FDIC–R is acting in its capacity as receiver or otherwise; (b) right to have any and all final orders in any and all non-core matters entered only after *de novo* review by a United States District Court Judge; (c) right to trial by jury in any proceeding as to any and all matters so triable therein, whether or not the same be designated legal or private rights, or in any case, controversy or proceeding related thereto, whether or not such jury trial right is pursuant to statute or the United States Constitution; or (d) other rights, claims, actions, defenses, setoffs, recoupments or other matters to which FDIC–R is entitled under any agreements or at law or in equity or under the United States Constitution. All of the foregoing rights are expressly reserved and preserved, without exception and without the intention or purpose of conceding jurisdiction in any way by this filing or by any other participation in this matter or in this case. FDIC–R expressly reserves all rights at law and equity to assert the preemption of the Bankruptcy Court's jurisdiction and the exclusive jurisdiction provided under Title 12, as applicable, with respect to FDIC–R.

Katten

Code of Federal Regulations; tax laws; Revenue Procedures; directives under title 26 of the United States Code ("Title 26"); corollary regulations under title 26 of the Code of Federal Regulations; title I Subdivisions B and C of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5; Worker, Homeownership and Business Assistance Act of 2009, Pub. L No. 111-92; and the force and effect of banking guidelines and policy statements issued by banking regulatory councils such as the Federal Financial Institutions Examination Council ("FFIEC"). Withdrawal of the reference is also warranted on permissive grounds based on judicial efficiency, conservation of resources and related concerns as no discovery has yet commenced and no dispositive motions have been filed.

This Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities attached hereto; Rule 5011 of the Federal Rules of Bankruptcy Procedure; Rule 6.1 of the Local Rules Governing Bankruptcy Appeals, Cases and Proceedings of the United States District Court, Central District of California; any reply papers the FDIC–R may file; and upon the records and files of this court and upon such further evidence and argument as may be presented at the hearing of this motion.

To the extent Local Civil Rule 7-3 applies to a motion to withdraw a reference, the parties met and conferred on this Motion and were unable to agree on the relief being sought herein.

February 22, 2011                        _____/s/ Joshua D. Wayser_____
                                         Counsel for FDIC–R

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO**
**WITHDRAW THE REFERENCE**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................1

II. BACKGROUND..................................................................................4
    A.    The Failure of Vineyard Bank. ..................................................4
    B.    Vineyard Bank Receivership. ....................................................4
    C.    VNBC's Bankruptcy Filing. ......................................................7
    D.    Bank and VNBC's Tax Relationship. .......................................7
    E.    VNBC and Bank's Insurance Policies. .....................................8
    F.    Adversary Proceeding. ...............................................................8
        1.    The Complaint. ...............................................................8
        2.    Answer and Counterclaims. ..........................................10
    G.    Other Laws to Be Considered in Resolution of the Adversary Proceeding...........11
        1.    Other Law No. 1 – 12 U.S.C. § 1821(j). ....................11
        2.    Other Law No. 2 – 12 U.S.C. § 1821(d). ....................12
        3.    Other Law No. 3 – 12 U.S.C. § 371...........................15
        4.    Other Law No. 4 – 12 C.F.R. § 563.41........................16
        5.    Other Law No. 5 – 12 U.S.C. § 1823(e). ....................16
        6.    Other Law No. 6 – *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 Fed. Reg. 64757-01, 1998 WL 804364 (Nov. 23, 1998).................17
        7.    Other Law No. 7 – 26 C.F.R. § 1.1502-77....................17
        8.    Other Law No. 8 – 28 U.S.C. § 1346............................18
        9.    Other Law No. 9 – 12 U.S.C. § 1821(c)(2)(C). ............18
        10.    Other Law No. 10 – 12 U.S.C. § 1831o and 12 C.F.R. §§ 225.4 and 325.105..............19
        11.    Other Law No. 11 – 12 U.S.C. § 1831o(e) and 12 C.F.R. § 325.104(h). ..20
        12.    Other Law No. 12 – 12 U.S.C. § 1831o(a) and 12 C.F.R. § 225.4............20
        13.    Other Law No. 13 – 28 U.S.C. § 1828(u). ..................21
        14.    Other Law No. 14 – 12 U.S.C. § 1821(d)(17) and 12 U.S.C. § 1821(g)...21

II. ARGUMENT ....................................................................................21
    A.    Under 28 U.S.C. § 157(d), Withdrawal of This Adversary Proceeding Is Mandatory Because Its Resolution Will Require the Involvement of Other Federal Laws. ...........................................22
    B.    Permissive Withdrawal Is Also Warranted...........................24

Katten

i

1.  Withdrawal of the Reference Promotes Efficient Use of Judicial
    Resources. ..................................................................................24

2.  Withdrawal of the Reference Promotes Judicial Economy Without
    Prejudicing Either Party. ...........................................................26

3.  Withdrawal of the Reference Prevents Forum Shopping. ...........26

III. CONCLUSION..............................................................................27

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

MOTION TO WITHDRAW THE REFERENCE

# I. INTRODUCTION

By its Motion, FDIC–R seeks to withdraw the reference of the Adversary Proceeding because its resolution requires not only consideration of title 11 of the United States Code (the "Bankruptcy Code"), but also substantial and material consideration of banking supervision laws under Title 12, FDIA, FDICIA, FIRREA, the corollary regulations interpreting the banking laws under title 12 of the Code of Federal Regulations, tax laws, Revenue Procedures and directives under Title 26 and corollary regulations under title 26 of the Code of Federal Regulations, title 1 Subdivisions B and C of the American Recovery and Reinvestment Act of 2009, Pub. L No. 111-92 and the force and effect of banking guidelines and policy statements issued by banking regulatory councils such as FFIEC.

The Adversary Proceeding involves claims for: (i) disallowance of FDIC–R's claims for fraudulent transfers, (ii) subordination of FDIC–R's claims based upon alleged inequitable conduct by FDIC–R as an open bank supervisor, (iii) declaratory relief regarding ownership of the tax refunds, and (iv) declaratory relief regarding ownership of insurance benefits. Indeed, resolution of the claims and counterclaims at issue in the Adversary Proceeding will, *inter alia*, involve substantial and material consideration of the following laws and policies other than those under the Bankruptcy Code:

- 12 U.S.C. § 1821(j) – Trustee's claims against FDIC in its capacity as receiver for inequitable conduct cannot be brought in this Court because no court may take any action to restrain or affect the exercise of powers of FDIC in its role as receiver;

- 12 U.S.C. § 1821(d)(13)(D) – Trustee's claims for tax refunds, premium refunds and insurance proceeds cannot be brought in this Court because courts do not have jurisdiction over any action seeking determination of rights with respect to Bank's assets;

- 12 U.S.C. § 1821(d)(2)(A) – tax refunds, premium refunds and insurance proceeds are property of FDIC–R because, upon its appointment, FDIC–R succeeds to all rights, titles, powers and privileges of Bank;

12 U.S.C. § 1821(d)(2)(B) – FDIC–R is required to collect all obligations and money due to Bank and preserve and conserve the assets and property of Bank, including tax refunds, premium refunds and insurance proceeds;

- 12 U.S.C. § 1821(d)(3)(A) – Trustee's claims for tax refunds, premium refunds and insurance proceeds are barred because it did not file a claim with FDIC–R;

- 12 U.S.C. § 371 and 12 C.F.R. § 563.41 – FDIC–R cannot be an unsecured creditor of VNBC pursuant to the tax sharing agreement because any such relationship would be void;

- 12 U.S.C. § 1823(e) – the tax sharing agreement is not binding on FDIC–R because it was not approved by Bank's board of directors or its loan committee; approval of the tax sharing agreement was not reflected in the minutes of said board or committee; and it was not continuously, from the time of its execution, an official record of Bank;

- *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 Fed. Reg. 64757-01, 1998 WL 804364 (Nov. 23, 1998) ("Interagency Policy") – Trustee's claim that the tax sharing agreement provides for VNBC's ownership of tax refunds is barred because the Interagency Policy prohibits a bank holding company, such as VNBC, from appropriating its subsidiary bank's tax refunds via a so-called tax sharing agreement;

- 26 C.F.R. § 1.1502-77 – any tax refunds received by VNBC's estate are strictly received in trust by VNBC in its capacity as agent for Bank and the receipt thereof does not provide VNBC's estate with ownership of, or any property interest or right to, any such refunds;

- 28 U.S.C. § 1346 – Trustee's claims against FDIC in its capacity as receiver for inequitable conduct are barred because no agency of the United States can be sued in its own name for tort actions when acting in the scope of its employment;

- 12 U.S.C. § 1821(c)(2)(C) – FDIC-R cannot be liable for acts of FDIC or any other regulatory agency prior to FDIC-R's appointment because, when acting in its capacity as receiver, FDIC-R is completely independent from any other agency or department of the United States;

- 12 U.S.C. § 1831o(e)(2)(C) and 12 C.F.R. § 325.104(h) – VNBC breached its capital maintenance obligations to maintain and guarantee the appropriate capital levels of Bank;

- 12 U.S.C. § 1831o(a) and 12 C.F.R. §§ 225.4 and 325.105 – FDIC cannot be considered an insider of VNBC because all actions it took with respect to Bank and VNBC with respect to capital maintenance obligations were within its regulatory authority;

- 28 U.S.C. § 1828(u) – Trustee's claims against FDIC-R for inequitable conduct due to alleged fraudulent transfers are barred because banking agencies are protected from such claims unless FDIC-R acted with the actual intent to hinder, delay or defraud;

- 12 U.S.C. § 1821(d)(17)(A) – FDIC-R has standing to avoid any of Bank's fraudulent transfers;

- 12 U.S.C. § 1821(d)(17)(D) – FDIC-R's right to avoid Bank's fraudulent transfers is superior to any rights of Trustee under the Bankruptcy Code; and

- 12 U.S.C. § 1821(g) – FDIC-R has standing to avoid fraudulent transfers arising under the California Uniform Fraudulent Transfer Act

(collectively, the "Other Laws").  Consideration of the Other Laws requires mandatory withdrawal of the reference of this Adversary Proceeding under 28 U.S.C. § 157(d).

1    Moreover, withdrawal of the reference is also warranted on permissive grounds based on

2    judicial efficiency, conservation of resources and related concerns because discovery has not

3    commenced and dispositive motions have not been filed in the Adversary Proceeding.

4                                    **II. BACKGROUND**

5

6    A.    <u>**The Failure of Vineyard Bank**</u>.

7        In his complaint, Trustee generally alleges the following course of events leading to the

8    failure of Vineyard Bank ("<u>Bank</u>") and appointment of FDIC as receiver for Bank. Bank suffered

9    substantial losses in its loan portfolio following a deterioration of national economic conditions.

10   Following its substantial losses, Bank and its holding company, Vineyard National Bancorp

11   ("<u>VNBC</u>") attempted to take actions to adjust Bank's overall risk profile. Despite such actions,

12   however, in May 2008, both Bank and VNBC were notified by their respective primary regulators

13   (the Office of the Comptroller of the Currency ("<u>OCC</u>") for Bank and the Board of Governors of the

14   Federal Reserve System ("<u>Reserve Bank</u>") for VNBC) that Bank was deemed in "troubled

15
16   condition." Thereafter, Bank and VNBC reported to their respective regulators, OCC and Reserve

17   Bank, regarding their efforts to, *inter alia*, improve Bank's capital maintenance and financial

18   condition. During this time, VNBC guaranteed Reserve Bank that Bank would be adequately

19   capitalized.

20
21   B.    <u>**Vineyard Bank Receivership**</u>.

22        However, Bank and VNBC's efforts failed and Bank was deemed to have inadequate capital.

23   On July 17, 2009, OCC closed Bank, seized control of its assets, books, records and other papers,

24   and appointed FDIC as receiver, which appointment FDIC accepted. Under federal law, specifically

25   12 U.S.C. §§ 1821(d)(2)(A)(i) and (B), FDIC–R, upon its appointment as receiver, succeeded to all

26   rights, titles, powers and privileges of Bank. This means, among other things, that FDIC–R

27   effectively stepped into the shoes of Bank, assuming both its assets and liabilities and operating as

28

its successor. 12 U.S.C. § 1821(d)(2)(B); *see also, O'Melveny & Meyers v. Fed. Deposit Ins. Corp.*, 114 S.Ct. 2048, 2054 (1994) (holding that, under the language of § 1821(d)(2)(A), FDIC "steps into the shoes" of the failed institution). FDIC's actions as receiver are completely independent from any other agency or department of the United States. 12 U.S.C. § 1821(c)(2)(C).

Importantly, through the Federal Institutions Reform, Recovery and Enforcement Act, Public Law 101-73, 103 Stat. 183 (1989), codified in various sections of Title 12 ("FIRREA"), Congress enacted a comprehensive and detailed statutory scheme which allows FDIC, in its capacity as receiver, to perform its duties as a receiver, conserve and preserve a failed institution's assets, liquidate those assets when appropriate, and use the proceeds of liquidation to make distributions to the institution's valid creditors.[2] *See, e.g.,* 12 U.S.C. §§ 1821(d)(2)(A)(ii), 1821(d)(2)(B) and (E). For example, when making distributions to creditors, FDIC–R must prioritize the payment of claims in accordance with federal statutory and regulatory requirements. 12 U.S.C. §§ 1821(i)(1) and (2); 12 C.F.R. § 360.2. Further, Congress has given FDIC–R discretion to determine the timing and amount of such distributions. 12 U.S.C. §§ 1821(d)(10)(A) and (B).

As an important part of FDIC–R's comprehensive scheme for liquidating assets and winding up failed financial institutions, Congress also created a statutory procedure for the orderly and efficient processing of all claims asserted against a failed bank receivership, as well as claims seeking a determination of rights with respect to assets of a receivership. That administrative claims process, set forth in 12 U.S.C. §§ 1821(d)(3) through (13), centralizes the initial consideration and resolution of claims against a failed financial institution by requiring that all claims against Bank be submitted to FDIC–R by a date certain that is established by FDIC–R (i.e., the "claims bar date"),

---

[2] FDIC-R is also required to minimize any loss to the Federal Deposit Insurance Fund. In this case, as of the date of Bank's closing, FDIC-R estimates that the ultimate cost to the Federal Deposit Insurance Fund, as a result of Bank's failure, will be approximately $579 million. *See* Vineyard Bank - Receivership Balance Sheet Summary (Unaudited), available at the FDIC's website at the following address: http://www2.fdic.gov/drrip/bal/balancesheet.asp.

before a party may commence litigation against FDIC–R. FDIC–R then is allowed up to 180 days to review each claim, and grant or deny those claims (in whole or in part), without the unnecessary delay and expense of actual litigation. *See* 12 U.S.C. § 1821(d)(5)(A)(i); *see also* H.R. Rep. No. 101-54(I), 101st Cong., 1st Sess., at 418-19, *reprinted in* 1989 U.S.C.C.A.N. 86, 215 (stating that § 1821(d)(5)(A)(i) was created to enable FDIC to dispose of the bulk of claims against failed institutions "expeditiously and fairly ... without burdening the District Courts.").

In this instance, pursuant to 12 U.S.C. § 1821(d)(4), FDIC–R established October 21, 2009 as the claims bar date for the Vineyard Bank receivership (the "Claim Deadline"). Accordingly, any party who believed it held a claim against the Vineyard Bank receivership (the "Receivership") was required to submit an administrative claim to FDIC–R no later than the Claim Deadline. In conformity with the requirements of FIRREA, FDIC–R caused notice of the Claim Deadline to be published multiple times in a local newspaper. Specifically, on July 23, 2009, August 24, 2009 and September 24, 2009, FDIC–R caused the Claim Deadline to be published in the *Los Angeles Times*, *Marin Independent Journal, Orange County Register, Press Enterprise, San Bernardino Sun* and *San Diego Tribune*. In addition, shortly after Bank's failure, notice of the Claim Deadline was also mailed directly to creditors who appeared on Bank's books and records. As a result of the notices that were provided by FDIC–R, approximately 175 claims were timely submitted to the Receivership. Critically, however, VNBC did not bother to submit any administrative claims relating to the subject matter of the Adversary Proceeding or otherwise. VNBC's failure to do so is crucial, because as explained further below, the failure to timely submit an administrative claim to FDIC–R forever bars the claims asserted by Trustee herein. Indeed, Trustee can have no greater rights than VNBC. Because VNBC failed to submit a timely claim to the Receivership, Trustee's claims on behalf of VNBC's bankruptcy estate, discussed below, are time-barred.

**C.**    **VNBC's Bankruptcy Filing.**

On July 21, 2009 (the "Petition Date"), four days after Bank had failed, VNBC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

On January 15, 2010, FDIC–R timely filed a proof of claim against VNBC ("FDIC–R's Proof of Claim") to protect its rights and eliminate any suggestion of waiver. FDIC–R's Proof of Claim sets forth FDIC–R's claims against VNBC, including claims for (i) tax entitlements; (ii) VNBC's breach of capital maintenance obligations; (iii) claims based on avoidance and/or recovery of fraudulent transfers; and (iv) tort claims (collectively, the "FDIC–R's Claims").

Pursuant to the order confirming VNBC's plan of liquidation entered on August 26, 2010 (the "Confirmation Order"), Bradley D. Sharp was appointed the liquidating trustee ("Trustee") of VNBC's bankruptcy estate (the "Bankruptcy Estate").

**D.**    **Bank and VNBC's Tax Relationship.**

As noted above, VNBC was Bank's holding company and sole shareholder.  From 2006 through 2008, VNBC and Bank filed consolidated tax returns.  VNBC and Bank also entered into a certain Corporate Income Tax Sharing Agreement dated as of January 3, 2007 (the "TSA"). Pursuant to the TSA, *inter alia*, (i) Bank paid the federal and state taxes on behalf of VNBC and Bank and all payments were allocated between Bank and VNBC as if the earnings and losses for each entity were on a separate return basis and (ii) if Bank incurred a tax loss, it was required to receive a refund in an amount in no less than the amount the Bank would have received as a separate entity, regardless of whether the consolidated group was receiving a refund.  During these years, VNBC only suffered losses and never received a refund.  Meanwhile, Bank had taxable income and all refunds received by the consolidated group were turned over to Bank.

In 2009, Congress amended the Internal Revenue Code through the Worker, Homeownership and Business Assistance Act of 2009, Public Law 111-92 (the "Amendment"). The Amendment, which became effective on November 6, 2009, extended the allowable time period for certain businesses to carry-back a net operating loss ("NOL") from two years to five years. The Amendment and Revenue Procedure 2009-52-4.01(3)-(4) (November 4, 2009) set September 15, 2010 as the mandatory deadline for filing an NOL carry-back election for tax years 2008 or 2009, but not both.

Prior to the September 15, 2010 deadline, FDIC–R and Trustee each filed competing and amended tax returns (Forms 1120x) with the IRS for calendar years ending 2003, 2004, 2005, 2006, and 2007. Based upon FDIC–R's investigation to date, the income tax refunds, credits, carryovers, benefits, intercompany tax payments or tax overpayments for which FDIC, as receiver for Bank, is entitled to payment from taxing authorities is approximately $20,000,000 (collectively, the "Tax Refunds").

**E.    VNBC and Bank's Insurance Policies.**

Prior to the Receivership, Bank purchased insurance for which Bank was a named insured and intended beneficiary. Such insurance includes, but is not limited to, coverage for claims against the directors and officers of VNBC and/or Bank for harm upon Bank by such directors and officers (the "D&O Policies"). FDIC–R is entitled to the proceeds from the D&O Policies and any premium refunds related thereto (collectively, the "Insurance Benefits").

**F.    Adversary Proceeding.**

**1.    The Complaint.**

On May 5, 2010, VNBC filed its complaint (the "Complaint") initiating the Adversary Proceeding against FDIC–R seeking, *inter alia*, (i) disallowance of FDIC–R's claims for fraudulent transfers from Bank to VNBC and shareholders or transferees of VNBC, (ii) subordination of FDIC–

R's Claims based upon alleged inequitable conduct by FDIC–R, (iii) declaratory relief that VNBC is

entitled to receive the Tax Refunds, and (v) declaratory relief that VNBC is entitled to the Insurance

Benefits. A copy of the Complaint is attached hereto as <u>Exhibit A</u>. Trustee subsequently substituted

in as plaintiff in the Adversary Proceeding pursuant to the Confirmation Order.

### a.    Disallowance of Fraudulent Transfer Claims.

Trustee alleges that FDIC–R does not have standing to pursue Bank's fraudulent transfer

claims and such claims should be barred because they are contingent and unmatured.

### b.    Subordination Based upon Inequitable Conduct.

While Trustee's claim for subordination of FDIC–R's claims for inequitable conduct are

couched in claims under the Bankruptcy Code, the essence of such claims is that FDIC–R, OCC

and/or Reserve Bank acted outside of their duties to place the interests of Bank ahead of the interests

of VNBC. Under the umbrella of inequitable conduct, Trustee also alleges a fraudulent transfer

claim against FDIC–R for Reserve Bank's requirement that VNBC assist Bank in maintaining its

capital maintenance obligations. Trustee alleges that VNBC received less than reasonably

equivalent value and less than fair consideration for its transfers to Bank, causing a reduction of

assets available for distribution to VNBC's estate in the bankruptcy case to the detriment of VNBC's

general unsecured creditors.

Trustee's request for subordination of FDIC–R's claims as a result of inequitable conduct

further alleges that FDIC–R was an insider of Bank and VNBC because (i) it had the "authority to

exercise control" over Bank and VNBC and (ii) OCC and Reserve Bank exercised control over Bank

and VNBC.

### c.    Ownership of Tax Refunds.

Trustee alleges the Bankruptcy Estate is entitled to the Tax Refunds and that the TSA allocated ownership of the Tax Refunds between VNBC and Bank.  Trustee further alleges that any legal right of FDIC–R to the Tax Refunds is solely as a general unsecured creditor.

### d.    Ownership of Insurance Benefits.

Trustee alleges that the Bankruptcy Estate is entitled any Insurance Benefits and that any legal right of FDIC–R to the Insurance Benefits is solely as a general unsecured creditor.

### 2.    Answer and Counterclaims.

Following the filing of the Complaint, VNBC and FDIC–R made several agreements to extend the time for FDIC–R to respond to the Complaint.  On November 18, 2010, FDIC–R timely filed its answer to the Complaint (the "Answer") and Counterclaims against Trustee.  A copy of the Answer and Counterclaims is attached hereto as Exhibit B.  Following Trustee's filing of an answer to FDIC–R's Counterclaims, on January 4, 2011, FDIC–R filed an amended Answer and amended Counterclaims against Trustee, seeking, *inter alia*, (i) declaratory relief that FDIC–R is the owner of the Tax Refunds; (ii) judgment against Trustee for VNBC's failure to sufficiently maintain the appropriate capitalization of Bank resulting in damages of at least $579 million; (iii) judgment against VNBC for fraudulent transfers made by Bank to VNBC; and (iv) declaratory judgment that FDIC–R owns the Insurance Benefits (collectively, the "Counterclaims").  Copies of Trustee's answer to the Counterclaims, the amended Answer and amended Counterclaims and Trustee's answer to amended Counterclaims are attached hereto as Exhibits C, D and E, respectively.

As set forth in detail directly below, resolution of FDIC–R's defenses to the Complaint and the Counterclaims involve substantial and material consideration of the Other Laws.

10
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO WITHDRAW THE REFERENCE

**G.**    <u>**Other Laws to Be Considered in Resolution of the Adversary Proceeding.**</u>

    **1.**    **Other Law No. 1 – 12 U.S.C. § 1821(j).**

Section 1821(j) of Title 12 provides that, "[e]xcept as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver."

Importantly, numerous courts have held that 12 U.S.C. § 1821(j) specifically prohibits a party, such as Trustee, from obtaining a declaratory judgment against FDIC–R, where the declaratory judgment would impede FDIC–R's exercise of one or more of its statutory duties or powers, or would prohibit FDIC–R from exercising control over property in which FDIC–R holds an interest. *See, e.g., Carney v. RTC*, 19 F.3d 950, 957 (5th Cir. 1994) ("claim for declaratory relief was an attempt to 'restrain or affect' the RTC's ability to exercise its authorized powers or functions" and thus § 1821(j) deprived the court of jurisdiction); *Steamboat Ventures, Ltd. v. Fed. Deposit Ins. Corp.*, 2009 WL 4797832 (N.D. Ga.) ("Not only does [12 U.S.C. § 1821(j)] bar injunctive relief, but ... where appellants seek a declaratory judgment that would effectively 'restrain' FDIC from foreclosing on their property, 12 U.S.C. § 1821(j) deprives the court of power to grant that remedy as well.") (citing *Freeman v. Fed. Deposit Ins. Corp.*, 56 F.3d 1394, 1398, 1399 (D.C. Cir. 1995)); *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703 (1st Cir. 1992) (federal court lacks jurisdiction to enjoin FDIC from foreclosing on a certificate of deposit to which it acquired a secured interest as receiver).

Here, through this action, Trustee seeks to restrain FDIC–R's ability to exercise at least six (6) of its core statutory powers or duties: (i) collect all obligations and money due the institution (12 U.S.C. § 1821(d)(2)(B)(ii)); (ii) take over the assets of and operate the insured depository institution and conduct all business of the institution (12 U.S.C. § 1821(d)(2)(B)(i)); (iii) preserve and conserve the assets and property of the institution (12 U.S.C. § 1821(d)(2)(B)(iv)); (iv) succeed by operation

of law to all rights, titles, powers and privileges of the failed insured depository institution, including

the assets of the institution (12 U.S.C. § 1821(d)(2)(A)(i)); (v) pursue fraudulent transfers (12 U.S.C.

§§ 1821(d)(17) and 1821(g); and (vi) take prompt corrective action to resolve problems of

depository institutions (12 U.S.C. § 1831o(a)).    Further, Trustee's declaratory judgment would

prohibit FDIC–R from exercising control over Receivership property, *i.e.*, the Tax Refunds and

Insurance Benefits.    Accordingly, Trustee's action is barred by 12 U.S.C. § 1821(j) and it is clear

that resolution of the Adversary Proceeding necessarily will require substantial and material

consideration of 12 U.S.C. § 1821(j).

### 2.        Other Law No. 2 – 12 U.S.C. § 1821(d).

As briefly noted above, FIRREA requires that all claims against a failed bank receivership

and claims seeking a determination of rights with respect to assets of a receivership[3] be processed

through FDIC's mandatory administrative claims process before a claimant, such as Trustee, may

commence litigation against FDIC, in its capacity as a receiver. Specifically, in 12 U.S.C. §

1821(d)(13), Congress made clear that the claims process is an absolute prerequisite to commencing

litigation by withdrawing jurisdiction from all courts to hear claims against a failed institution for

which FDIC has been appointed receiver:

> (D) Limitation on judicial review
>
> Except as otherwise provided in this subsection, no court shall
> have jurisdiction over –
>
> **(i) any claim or action for payment from, or any action seeking
> a determination of rights with respect to, the assets of any
> depository institution for which the Corporation has been
> appointed receiver**, including assets which the Corporation may
> acquire from itself as such receiver; or

---

[3] To be sure, the administrative claims process applies to actions seeking a determination of whether an asset, such as the Tax Refunds, are property of a receivership. *See, e.g., In re Am. Mortgage & Inv. Servs., Inc. v. Resolution Trust Corp.*, 141 B.R. 578, 582-83 (Bankr. D.N.J. 1992) (finding FIRREA's claims administration procedure applies and deprives courts of jurisdiction even where the failed institution's actual ownership over the asset is in dispute).

Katten

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

(ii) any claim relating to any act or omission of such institution or
the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D) (emphasis added). Notably, jurisdiction is "otherwise provided" by 12

U.S.C. § 1821(d) only for a claimant that has actually submitted a proof of claim to FDIC–R and

completed the administrative claims process. *See* 12 U.S.C. §§ 1821(d)(6)(A)(ii), (d)(7)(A),

(d)(8)(C); *Sharpe v. Fed. Deposit Ins. Corp.*, 126 F.3d 1147 (9th Cir. 1997) ("The 'except as

otherwise provided' language refers to the provision that allows courts jurisdiction after the

administrative claims process has been completed."). Simply put, Congress barred all courts -- state

and federal -- from hearing any claims against FDIC, in its capacity as receiver, unless and until the

claimant first submits an administrative claim to FDIC against the Receivership and completes the

administrative claims process. *See* 12 U.S.C. § 1821(d)(13)(D).

Indeed, as the Eleventh Circuit recognized in *Stamm v. Paul*, 121 F. 3d 635 (11th Cir. 1997),

> Congress anticipated that, as a receiver for failed lending entities, the [FDIC]
> would face numerous claims from various parties. Accordingly, it sought to
> reduce the volume of formal litigation that otherwise would have resulted by
> providing for administrative review of such claims by the [FDIC] before
> judicial proceedings could commence.

*Id.* at 639. Put differently, "the administrative procedure exhaustion requirement of FIRREA is

statutory, not judicial," and courts "are therefore not at liberty to ignore the statutory command."

*Fed. Deposit Ins. Corp. v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 136 (3d Cir. 1991).

Every circuit court of appeals – including the Ninth Circuit – has held that courts lack

jurisdiction over claims asserted against FDIC, in its capacity as receiver, prior to exhaustion of the

administrative claims process. *See, e.g., Henderson v. Bank of New England*, 986 F.2d 319 (9th Cir.

1993) ("Section 1821(d)(13)(D) strips all courts of jurisdiction over claims made outside the

administrative procedures of section 1821 ... a claimant must therefore first complete the claims

13

1   process before seeking judicial review."); *Simon v. Fed. Deposit Ins. Corp.*, 48 F.3d 53, 56 (1st Cir.

2   1995) ("Section 1821(d)(13)(D)(i) bars all claims against the assets of a failed financial institution

3   which have not been presented under the administrative claims review process"); *RTC v. Elman*, 949

4   F.2d 624, 627 (2d Cir. 1991) ("[T]he statute means just what it says ... that a claimant must first

5   present its case to [FDIC] under the administrative procedure erected by FIRREA before seeking

6   relief in the federal courts."); *Praxis Props., Inc. v. Colonial Sav. Bank*, 947 F.2d 49, 63 (3d Cir.

7   1991); *Brady Dev. Co. v. RTC*, 14 F.3d 998, 1005-06 (4th Cir. 1994) ("Exhaustion of administrative

8   remedies is a requirement for efficiently administering the massive volume of claims."); *Meliezer v.

9   RTC*, 952 F.2d 879, 882 (5th Cir. 1992) ("[S]ection 1821(d)(13)(D) clearly establishes a statutory

10  exhaustion requirement."); *In re Lewis*, 398 F.3d 735, 744 (6th Cir. 2005); *Maher v. Fed. Deposit

11  Ins. Corp.*, 441 F.3d 522, 525 (7th Cir. 2006); *Bueford v. RTC*, 991 F.2d 481, 485 (8th Cir. 1993)

12  ("Every court that has considered the issue has found exhaustion of FIRREA's administrative

13  remedies to be a jurisdictional prerequisite to suit in district court."); *RTC v. Mustang Partners*, 946

14  F.2d 103, 106 (10th Cir. 1991); *Stamm*, 121 F.3d at 635; *Freeman v. Fed. Deposit Ins. Corp.*, 56

15  F.3d 1394, 1400 (D.C. Cir. 1995).

16      VNBC's failure to timely submit an administrative claim to FDIC–R is binding on Trustee in

17  this instance. After all, Trustee stands in VNBC's shoes and can only bring actions that VNBC itself

18  would be able to bring. *See, e.g., Stumpf v. Albracht*, 982 F.2d 275, 277 (8th Cir. 1992) (holding that

19  the fact that the trustee, rather than the debtor, filed the case cannot revive an issue that is barred by

20  the statute of limitations).

21      In sum, FIRREA makes clear that no court has jurisdiction to hear claims against FDIC–R

22  unless and until the claimant has pursued and completed the mandatory administrative claims

23  process. Accordingly, FDIC–R has raised VNBC's failure to submit an administrative claim as an

1   affirmative defense to Trustee's Complaint and will also eventually seek to dismiss this action based,

2   in part, on that very same failure. Therefore, a resolution of the Adversary Proceeding and a

3   determination of Trustee's claims and FDIC–R's Counterclaims will require material and substantial

4

5   consideration of 12 U.S.C. § 1821(d).

6             **3.     Other Law No. 3 – 12 U.S.C. § 371.**

7          In his Complaint, Trustee relies upon the TSA as a basis for his suggestion that the Tax

8   Refunds belong to VNBC's bankruptcy estate, rather than FDIC–R. More specifically, Trustee

9   argues that the TSA vests ownership of the Tax Refunds with VNBC and creates an unsecured

10   debtor-creditor relationship between VNBC and Bank.

11         While FDIC–R disputes both Trustee's interpretation and characterization of the TSA, it

12   must be noted that accepting either Trustee's interpretation or characterization of the TSA as true

13   renders the TSA completely illegal and void under applicable federal banking law. Specifically, 12

14   U.S.C. § 371c(c) mandates that "[e]ach loan or extension of credit to ... an affiliate by a member

15   bank or its subsidiary *shall be secured* at the time of the transaction...." (emphasis added). The term

16

17   "affiliate" includes "any company that controls the member bank...." 12 U.S.C. § 371c(b)(1)(A). As

18   a result, pursuant to 12 U.S.C. § 371c(c), a member bank, such as Bank, cannot make a loan or

19   extension of credit to its holding company, such as VNBC, unless that loan or extension of credit is

20   secured by the requisite collateral. Nevertheless, Trustee argues that Bank and VNBC did exactly

21   this – entered into an illegal agreement through which Bank became an unsecured creditor of VNBC

22

23   – and then asks the Court to enforce the illegal agreement. Regardless of whether Trustee can ever

24   navigate around this obvious problem, it is clear that a resolution of the Adversary Proceeding and a

25   determination of Trustee's claims and FDIC–R's Counterclaims will require material and substantial

26   consideration of 12 U.S.C. § 371c(c).

27

28

**4.      Other Law No. 4 – 12 C.F.R. § 563.41.**

Pursuant to 12 C.F.R. § 563.41,

> If OTS determines that a particular transaction is, in substance, a loan or extension of credit to an affiliate ... OTS may inform the savings association that the transaction is prohibited under this paragraph (c)(1), and require the savings association to divest the loan, unwind the transaction or take other appropriate action.

12 C.F.R. § 563.41(c)(1)(ii).  As a result, a violation of 12 U.S.C. § 371c(c) can actually result in the undoing of a transaction, such as the TSA, and a finding that any loan agreement contrary thereto is a violation of federal banking laws.  Accordingly, any resolution of Trustee's allegations that the TSA created a debtor-creditor relationship between Bank and VNBC will necessarily require substantial and material consideration of 12 C.F.R. § 563.41.

**5.      Other Law No. 5 – 12 U.S.C. § 1823(e).**

Even ignoring for a moment the obvious illegality of the contract on which Trustee relies, Trustee's claim still cannot succeed unless he can also establish that the TSA is actually binding on FDIC–R, as compared to Bank.  However, 12 U.S.C. § 1823(e) provides that, in order for an agreement to be binding on FDIC–R, the agreement must: (i) be in writing; (ii) be executed by the depository institution and any person claiming an adverse interest thereunder; (iii) be approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee; and (iv) have been, continuously, from the time of its execution, an official record of the depository institution.  In this case, regardless of whether the TSA could ever be considered a legal contract, FDIC–R separately disputes that the TSA can meet the requirements of 12 U.S.C. § 1823(e).  Tellingly, Trustee failed to provide even such bare allegations in his Complaint.  Accordingly, a resolution of the Adversary Proceeding and a determination of Trustee's claims and FDIC–R's Counterclaims will require material and substantial consideration of 12 U.S.C. § 1823(e).

16
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO WITHDRAW THE REFERENCE

6. **Other Law No. 6 – *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 Fed. Reg. 64757-01, 1998 WL 804364 (Nov. 23, 1998).**

More than 12 years ago, the OCC, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision and FDIC, collectively formulated and published the *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 Fed. Reg. 64757-01, 1998 WL 804364 (Nov. 23, 1998) ("Interagency Policy"). Through the Interagency Policy, these federal banking regulatory agencies specifically construed 12 U.S.C. § 371c(c) as prohibiting a bank holding company, such as VNBC, from appropriating its subsidiary bank's tax refunds via a so-called tax sharing agreement. Here, Trustee is seeking a declaratory judgment that – under the TSA – VNBC became the owner of the Tax Refunds, even though the Tax Refunds may have otherwise belonged to Bank. Thus, it is clear that a resolution of the Adversary Proceeding and a determination of Trustee's claims and FDIC–R's Counterclaims will require material and substantial consideration of the Interagency Policy promulgated by the various federal banking authorities.

7. **Other Law No. 7 – 26 C.F.R. § 1.1502-77.**

As noted above, through his Complaint Trustee asserts that, rather than sharing, for example, a principal-agent relationship, the consolidated tax filings and TSA created a debtor-creditor relationship between VNBC and Bank. However, Treasury Regulation § 1.1502-77 expressly provides that a parent company, such as VNBC, will serve merely in the capacity of an "agent" for purposes of a consolidated tax group in regard to dealings with the IRS, including the filing of tax returns, making of tax payments <u>and receiving of refunds</u>. Thus, Treasury Regulation § 1.1502-77 directly contravenes Trustee's stated position and it is clear that a resolution of the Adversary Proceeding and a determination of Trustee's claims and FDIC–R's Counterclaims will require material and substantial consideration of the impact and affect of 26 C.F.R. § 1.1502-77.

**8.    Other Law No. 8 – 28 U.S.C. § 1346.**

While Trustee's request to subordinate FDIC–R's claim for inequitable conduct fails to identify why any conduct by FDIC–R was "inequitable," the claim may be construed to sound in tort. To the extent the claim is actually found to be based in tort, such claim is barred by 28 U.S.C. § 1346(b). The Federal Tort Claims Act waives sovereign immunity in tort actions brought against any governmental employee acting within the course and scope of its employment. 28 U.S.C. § 1346(b). The act further provides that no agency can be sued in its own name for claims cognizable under 28 U.S.C. § 1346(b). 28 U.S.C. § 2679(a). Such claims must be brought against the United States and include claims for "loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

As a result, determination of whether Trustee can bring claims against FDIC–R for the alleged inequitable conduct based in tort will require substantial and material consideration of 28 U.S.C. § 1346(b).

**9.    Other Law No. 9 – 12 U.S.C. § 1821(c)(2)(C).**

Trustee's allegations that FDIC–R was an insider of Bank and VNBC by virtue of OCC and Reserve Bank's control over Bank and VNBC is completely contrary to the provisions set forth in 12 U.S.C. § 1821(c)(2)(C), which provides that when FDIC is acting as a receiver, it shall not be subject to the direction or supervision of any other agency or department of the United States or any State in the exercise of FDIC–R's rights, powers and privileges.

As a result, resolution of this action and Trustee's claims necessarily will require substantial and material consideration of 12 U.S.C. §1821(c)(2)(C).

10.    **Other Law No. 10 – 12 U.S.C. § 1831o and 12 C.F.R. §§ 225.4 and 325.105.**

Trustee's allegations that FDIC–R acted outside of its regulatory authority when OCC and Reserve Bank required certain actions by Bank and VNBC is contrary to FDIC–R, OCC and Reserve Bank's regulatory authority set forth in FIRREA. Pursuant to FIRREA, banking agencies are required to resolve the problems of insured depository institutions at the least possible long-term loss to FDIC's deposit insurance fund. 12 U.S.C. §1831o(a)(1); 12 C.F.R. §225.4(a). Once an insured depository institution is deemed undercapitalized, as the Bank was, FDIC is required to monitor the condition of such institution. 12 C.F.R. § 325.105(a). FDIC is also required to take prompt corrective action to resolve the problems of insured depository institutions. 12 U.S.C. § 1831o(a). In that regard, banking agencies are charged with (i) closely monitoring the condition of any undercapitalized insured depository institution; (ii) closely monitoring compliance with capital restoration plans, restrictions, and requirements imposed under Title 12; and (iii) periodically reviewing the plan, restrictions, and requirements applicable to any undercapitalized insured depository institution to determine whether the plan, restrictions, and requirements are achieving the purpose of the statute. 12 U.S.C. § 1831o(e)(1).

Any undercapitalized insured depository institution must submit an acceptable capital restoration plan to its regulator specifying, *inter alia*, (i) the steps the insured depository institution will take to become adequately capitalized; (ii) the levels of capital to be attained during each year in which the plan will be in effect; (iii) how the institution will comply with the restrictions or requirements of Title 12; and (iv) the types and levels of activities in which the institution will engage. 12 U.S.C. § 1831(o)(e)(2). Moreover, undercapitalized insured depository institutions are prohibited from doing any of the following without FDIC's prior written approval:

> (A) Entering into any material transaction other than in the usual course of business, including any investment, expansion,

1  acquisition, sale of assets, or other similar action with respect to
2  which the depository institution is required to provide notice to the
   appropriate Federal banking agency; (B) Extending credit for any
3  highly leveraged transaction; (C) Amending the institution's
   charter or bylaws, except to the extent necessary to carry out any
4  other requirement of any law, regulation, or order; (D) Making any
   material change in accounting methods; (E) Engaging in any
5  covered transaction (as defined in section 23A(b) of the Federal
   Reserve Act (12 U.S.C. 371c(b)); (F) Paying excessive
6  compensation or bonuses; (G) Paying interest on new or renewed
   liabilities at a rate that would increase the institution's weighted
7  average cost of funds to a level significantly exceeding the
   prevailing rates of interest on insured deposits in the institution's
8  normal market areas; and (H) Making any principal or interest
9  payment on subordinated debt beginning 60 days after becoming
   critically undercapitalized.
10

11  12 C.F.R. § 325.105(a)(4).

12      As a result, resolution of this action and Trustee's claims necessarily will require substantial

13  and material consideration of 12 U.S.C. § 1831o and 12 C.F.R. §§ 225.4 and 325.105.

14      11.    **Other Law No. 11 – 12 U.S.C. § 1831o(e) and 12 C.F.R. § 325.104(h).**

15      Pursuant to 12 U.S.C. § 1831o(e), VNBC was required to guarantee the capital maintenance

16  obligations of Bank. VNBC failed to uphold such obligations and one of FDIC–R's Counterclaims

17  is against Trustee for such failure, which resulted in over $579 million in damages to FDIC–R. As a

18  result, the resolution of the Adversary Proceeding will require substantial and material consideration

19  of federal banking laws governing the regulatory supervision of troubled depository institutions and

20  their holding companies. *See, e.g.,* 12 U.S.C. § 1831o(e) and 12 C.F.R. § 325.104(h).

21      12.    **Other Law No. 12 – 12 U.S.C. § 1831o(a) and 12 C.F.R. § 225.4.**

22      Pursuant to 12 U.S.C. § 1831(a) and 12 C.F.R. § 225.4, a bank holding company shall serve

23  as a source of financial and managerial strength to its subsidiary banks and shall not conduct its

24  operations in an unsafe or unsound manner. VNBC failed to uphold such duties and is liable to

25

26

27

28

1  FDIC–R for resultant damages.  As a result, the resolution of the Adversary Proceeding will require

2  substantial and material consideration of 12 U.S.C. § 1831(a) and 12 C.F.R. § 225.4.

3         **13.    Other Law No. 13 – 28 U.S.C. § 1828(u).**

4         Trustee's allegations that FDIC–R is liable to VNBC for the alleged fraudulent transfers that

5  OCC and Reserve Bank required VNBC to make to Bank is barred by 28 U.S.C. § 1828(u), which

6  provides that banking agencies are protected from such claims unless they acted with the actual

7  intent to hinder, delay or defraud.  Trustee fails to allege that FDIC–R acted with actual intent to

8  hinder, delay or defraud and, therefore, resolution of Trustee's claims will require material and

10 substantial consideration of 28 U.S.C. § 1828(u).

11        **14.    Other Law No. 14 – 12 U.S.C. § 1821(d)(17) and 12 U.S.C. § 1821(g).**

12        FIRREA provides FDIC–R with the authority to avoid and recover fraudulent transfers

13 within five years of the establishment of the Receivership as well as fraudulent transfers arising

14 under state law.   12 U.S.C. §§ 1821(d)(17)(A) and 1821(g).   FDIC–R's right to avoid such

15 fraudulent transfers is superior to any rights of a trustee under title 11, such as Trustee.  12 U.S.C.

16 § 1821(d)(17)(D).  As a result, Trustee's claims that FDIC–R is without standing or the ability to

18 pursue the fraudulent claims of Bank as reserved for in FDIC–R's Proof of Claim are without merit

19 and resolution thereof will require material and substantial consideration of 12 U.S.C. § 1821(d)(17)

20 and 12 U.S.C. § 1821(g).

21                           **II. ARGUMENT**

22        A district court has original but not exclusive jurisdiction over all civil proceedings arising

23 under, arising in, or related to cases under the Bankruptcy Code.  28 U.S.C. § 1334(b).  Pursuant to

25 28 U.S.C. § 157(a), a district court, such as this District Court, generally refers all such cases or

26 proceedings to the bankruptcy judges of its district.

27

28

1    However, a district court's power to refer such cases or proceedings is limited by 28 U.S.C.

2  § 157(d), which provides that:

3        The district court may withdraw, in whole or in part, any case or
         proceeding referred under this section, on its own motion or on
4        timely motion of any party, for cause shown. <u>The district court
         shall</u>, on timely motion of a party, <u>so withdraw a proceeding if the
5        court determines that resolution of the proceeding requires
         consideration of</u> both title 11 <u>and other laws of the United States
6        regulating organizations or activities affecting interstate
         commerce.</u>
7

8  28 U.S.C. § 157(d) (emphasis added). Indeed, by its plain language, 28 U.S.C. § 157(d) provides for

9  either (i) the mandatory withdrawal of a matter pending in bankruptcy court if such matter involves,

10  in addition to issues arising under the Bankruptcy Code, other federal law, such as FIRREA, which

11  affects interstate commerce or the regulation of organizations, or (ii) for the discretionary withdrawal

12  of a bankruptcy matter for "cause shown."

13

14  A.    **Under 28 U.S.C. § 157(d), Withdrawal of This Adversary Proceeding Is Mandatory
         Because Its Resolution Will Require the Involvement of Other Federal Laws.**
15

16        Not surprisingly, courts across the country, including at least one court within the Ninth

17  Circuit, have routinely and consistently held that, under 28 U.S.C. § 157(d), the reference of an

18  adversary proceeding must be withdrawn if the resolution of the case will require a determination of

19  one or more provisions of FIRREA. *See, e.g., Lubin v. Cincinnati Ins. Co.,* 411 B.R. 801, 804 (N.D.

20  Ga. 2009) (holding that withdrawal of the reference was <u>mandatory</u> where resolution of the

21  proceeding required consideration of FIRREA); *CM Capital Servs., LLC v. Stewart Title of Nevada,*

22  2010 WL 4606523, *2 (Bankr. D. Nev. Nov. 05, 2010) (finding that "cases involving FIRREA

23  require <u>mandatory</u> withdrawal of the reference.") (emphasis added); *Franklin Sav. Corp. v. Office of*

24  *Thrift Supervision (In re Franklin Sav. Corp.),* No. 93-7001, 1994 WL 114652, at *4-5 (Bankr. D.

25  Kan. Jan. 18, 1994) (holding withdrawal of reference of three adversary proceedings requiring

26  consideration of FIRREA was <u>mandatory</u> under 12 U.S.C. § 157(d)); and *Morris v. Resolution Trust*

27

28

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO WITHDRAW THE REFERENCE

*Corp. (In re Mid. Am. Entm't Plus, Inc.)*, 135 B.R. 419, 422-23 (D. Kan. 1991) (holding that withdrawal of the reference was <u>mandatory</u> given defense raised by RTC that the bankruptcy court was without jurisdiction by virtue of FIRREA).

While Trustee's Complaint may be framed in terms of the Bankruptcy Code, the essence of his claims involve substantial and material consideration of the Other Laws, including (i) whether 12 USC § 371c(c) prohibits the VNBC-creditor relationship Trustee alleges has been established by the TSA and, if the TSA creates such a relationship, whether the TSA is illegal and void pursuant to FIRREA; (ii) whether the alleged VNBC-creditor relationship is further prohibited by the Interagency Policy; (iii) whether the TSA is void or voidable under 12 C.F.R. § 563.41; (iv) whether Trustee's claims are barred by the sweeping protections afforded to FDIC–R under 12 U.S.C. § 1821(j); (v) whether the TSA is enforceable against FDIC–R under 12 U.S.C. § 1823(e); (vi) whether FDIC–R's relationship with VNBC is governed by 26 C.F.R. § 1.1502-77; (vii) whether FDIC–R is liable for any acts of other regulatory agencies pursuant to 12 U.S.C. § 1821(c)(2)(C); (viii) whether FDIC–R's actions with respect to the capital maintenance obligations of Bank and VNBC were within FDIC–R's regulatory authority set forth in 12 U.S.C. § 1831o(a); (ix) whether claims of inequitable conduct against FDIC–R are barred by 28 U.S.C. § 1346; (x) whether Trustee's claims based upon fraudulent transfers are barred by 28 U.S.C. § 1828(u); (xi) whether VNBC breached its capital maintenance obligations under 12 U.S.C. § 1831o(e)(2)(C); and (xii) whether FDIC–R's claim for fraudulent transfers should be allowed pursuant to 12 U.S.C. §§ 1821(d)(17) and 1821(g). Accordingly, the withdrawal of this Adversary Proceeding is mandatory.

In short, the Court will be called upon to interpret questions of federal banking law completely unrelated to bankruptcy law. Because Congress meant for district courts, not bankruptcy courts, to decide such matters, withdrawal of the reference is mandatory.

**B.** **Permissive Withdrawal Is Also Warranted.**

To be sure, various provisions of non-bankruptcy federal law, including primarily FIRREA, will ultimately dictate the manner in which this tax refund dispute is resolved and, therefore, it is clear that withdrawal of the reference of the Adversary Proceeding is mandatory. However, even if this Court were to somehow conclude that withdrawal of the reference is not necessarily mandatory, it is obvious that permissive withdrawal of the reference certainly would be appropriate. "Cause shown" is not defined in 28 U.S.C. § 157(d). In determining whether cause is shown to withdraw the reference, district courts consider several non-exclusive factors, including (i) efficient use of judicial resources, (ii) risk of prejudice to any party and (iii) the prevention of forum shopping. *Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers*, 124 F.3d 999, 1008 (9th Cir. 1997) (citing *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993)).

**1. Withdrawal of the Reference Promotes Efficient Use of Judicial Resources.**

In 1984, Congress amended the Bankruptcy Code in response to the Supreme Court's decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858 (1982) (holding the broad jurisdiction granted to the bankruptcy courts under the 1978 Bankruptcy Act was unconstitutional). The current structure is based, in large part, upon the distinction between "core" and "non-core" matters. Essentially, a "core proceeding" in bankruptcy is one that "invokes a substantive right provided by title 11 or...a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *In re Gruntz*, 202 F.3d 1074 (9th Cir. 2000) (emphasis added) (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)). The distinction between whether a matter is considered "core" or "non-core" is important, because unless all of the parties otherwise agree, bankruptcy courts cannot enter final orders in non-core matters without the consent of all parties, and instead are relegated to entering proposed findings and conclusions which are then reviewed – *de novo* – by the district court. 28 U.S.C. § 157(c)(2).

24

1    In the context of the foregoing, it should be noted that Trustee's Adversary Proceeding

2    clearly involves "non-core" claims because some of the claims, including the Tax Refund claims, the

3    fraudulent transfer claims and the insurance benefit claims, (1) do not invoke a substantial right

4    created by the Bankruptcy Code and (2) can exist outside of bankruptcy. *See Sec. Farms*, 124 F.2d

5    at 1008 (non-core claims are those that do not depend on the Bankruptcy Code for their existence

6    and could proceed in another court). As a result, in this action, the Bankruptcy Court, at most, may

7    only "submit proposed findings of fact and conclusions of law to the district court" subject to *de*

8

9    *novo* review by this District Court, unless all parties consent to the Bankruptcy Court's entry of final

10   orders. 28 U.S.C. §§ 157(c)(1) and (2). Because FDIC–R does not consent to the entry of any final

11   orders or judgments by the Bankruptcy Court in this action, if the Adversary Proceeding remains in

12   the Bankruptcy Court, every decision will be subject to at least two layers of consideration with

13

14   respect to the determination of who is entitled to the Tax Refunds.

15   Not surprisingly, in adversary proceedings such as this one which involve a determination of

16   non-core claims, courts have found that withdrawal of the reference promotes the efficient use of

17   judicial resources. Specifically, courts have found that judicial economy is promoted where an

18   action involves non-core claims and one party does not consent to the bankruptcy court's entry of

19   final orders and the district court will be required to consider the matters in any event. *See, e.g., In*

20

21   *re Congoleum Corp.*, 414 B.R. 44, 61 (D.N.J. 2009) ("The Court takes this action in the interests of

22   judicial economy and to avoid potential repetitive appeals and piecemeal litigation."). In fact, the

23   Ninth Circuit's decision in *Security Farms, supra*, is instructive on this issue:

24               In this case efficiency was enhanced by withdrawing the reference
                 because non-core issues predominate. The Growers' state law
25               claims did not depend on Title 11, but were in federal court only
                 because of their potential impact on the administration of Local
26               890's estate. They were non-core. Inasmuch as a bankruptcy
27               court's determinations on non-core matters are subject to *de novo*

28

> review by the district court, unnecessary costs could be avoided by
> a single proceeding in the district court.

*Sec. Farms*, 124 F.3d at 1008 (internal citations omitted) (*citing In re Mann*, 907 F.2d 923, 926 (9th Cir. 1990)).

In addition, regardless of whether Trustee's claims are considered core or non-core, given the profound significance of the tax refund ownership issue to both FDIC–R and Trustee, an appeal is highly likely, and thus this Court will be required to consider these matters in any event. Consequently, withdrawal in such circumstances promotes judicial economy, avoids piecemeal litigation and presents a single forum where the issues can be resolved in a just and economical fashion. *Id.*

**2. Withdrawal of the Reference Promotes Judicial Economy Without Prejudicing Either Party.**

Withdrawing the reference of the Adversary Proceeding promotes judicial economy without prejudicing either party. First, the Adversary Proceeding is in its infancy; neither party has briefed the legal issues raised by the Adversary Proceeding and discovery has not been commenced. Accordingly, the Bankruptcy Court does not have any greater familiarity than this District Court with the underlying facts and circumstances or competing legal theories involved in this action. Second, VNBC has already confirmed its liquidation plan and, thus, withdrawal of the reference could not and will not impede any reorganization effort by VNBC.

**3. Withdrawal of the Reference Prevents Forum Shopping.**

Withdrawing the reference will prevent forum shopping. Under 12 U.S.C. § 1821(d)(6)(A), a suit against FDIC, in its capacity as receiver, if it can be brought at all, may only be commenced "in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia." (Emphasis added.)  If this District Court allows this action to go forward in the

1   Bankruptcy Court, future litigants will be encouraged to forum shop (and to attempt to ignore the

2   comprehensive and detailed statutory scheme Congress created through Title 12) based on the

3   suggestion that actions against FDIC as a receiver may be brought in bankruptcy courts despite the

4   plain language of 12 U.S.C. § 1821(d)(6)(A) and every signal of intent from Congress.

### III. CONCLUSION

6
7        The reference of this Adversary Proceeding should be withdrawn because resolution of

8   Trustee's claims and FDIC–R's Counterclaims will require material and substantial consideration of

9   non-bankruptcy laws, including banking supervision laws under Title 12, FDIA, FDICIA, FIRREA,

10  the corollary regulations interpreting the banking laws under title 12 of the Code of Federal

11  Regulations, tax laws, Revenue Procedures and directives under Title 26 and corollary regulations

12  under title 26 of the Code of Federal Regulations, title I Subdivisions B and C of the American

13  Recovery and Reinvestment Act of 2009, Pub. L No. 111-92 and the force and effect of banking

14  guidelines and policy statements issued by banking regulatory councils such as FFIEC. Further, this

15  District Court, in the exercise of its discretion, should otherwise withdraw the reference of this

16  Adversary Proceeding because (i) withdrawal will promote efficient use of judicial resources, (ii)

17  there will not be any delay or additional costs imposed on the parties and (iii) withdrawal prevents

18  forum shopping.

19
20
21
22  Dated: February 22, 2011                    ___/s/ Joshua D. Wayser___

23                                              *Counsel for FDIC–R*

24
25
26
27
28

**CERTIFICATE OF SERVICE**

I, Joshua D. Wayser, hereby certify that on February 22, 2011, I caused the foregoing Motion, Memorandum of Law, and exhibits thereto to be served on the following via U.S. Mail and by electronic mail, when noted:

Debtor
Vineyard National Bancorp
4000 Barranca Parkway
Suite 250
Los Angeles, CA 90067

Debtor's Counsel
Jon L Dalberg
Landau Gottfried & Berger LLP
1801 Century Pk East, Ste. 1460
Los Angeles, CA 90067

Rodger M Landau
Landau Gottfried & Berger LLP
1801 Century Park E Ste 1460
Los Angeles, CA 90067

United States Trustee
United States Trustee (LA)
725 S Figueroa St., 26th Floor
Los Angeles, CA 90017

Trustee's Counsel
Rolf S. Woolner
Winston & Strawn LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
rwoolner@winston.com
(via U.S. Mail and Email)

Bankruptcy Court
Honorable Richard M. Neiter
United States Bankruptcy Court - Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1652
Los Angeles, CA 90012

_____  /s/ Joshua D. Wayser

# EXHIBIT A

1   JOHN P. REITMAN (State Bar No. 80579)
    JON L. R. DALBERG (State Bar No. 128259)
2   RODGER M. LANDAU (State Bar No. 151456)
    LANDAU GOTTFRIED & BERGER LLP
3   1801 Century Park East, Suite 1460
    Los Angeles, California 90067
4   Telephone: (310) 557-0050
    Facsimile: (310) 557-0056
5   jreitman@lgbfirm.com
    jdalberg@lgbfirm.com
6   rlandau@lgbfirm.com

7   Counsel for Vineyard National Bancorp

8              UNITED STATES BANKRUPTCY COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

12
                                          | Bk. No. 2:10-bk-21661-RN
13   In re

14   VINEYARD NATIONAL BANCORP,
                                          | Chapter 11
15            Debtor.

16                                        | Adv. Pro. No.

17                                        | **COMPLAINT: (1) OBJECTING TO FDIC
                                          | CLAIM; (2) FOR SUBORDINATION OF
18                                        | FDIC CLAIM; AND (3) COUNTERCLAIM
                                          | FOR DECLARATORY RELIEF**

19

20   VINEYARD NATIONAL BANCORP;

21                  Plaintiff.

22        v.

23   FEDERAL DEPOSIT INSURANCE
     CORPORATION, AS RECEIVER FOR
24   VINEYARD BANK, NATIONAL
     ASSOCIATION,

25                  Defendant.

26

27

28

LANDAU
GOTTFRIED &
BERGER LLP

1   Vineyard National Bancorp, a California corporation ("VNBC," or the "Debtor"), debtor in

2   possession, for its claims against defendant herein, alleges as follows:

3   I.

4   **JURISDICTION AND VENUE**

5   1.      This adversary proceeding arises out of and is related to the bankruptcy case *In re*

6   *Vineyard National Bancorp*, Case No. 2:10-bk-21661-RN (the "Bankruptcy Case"). The

7   Bankruptcy Case was commenced by a voluntary petition (the "Petition") under chapter 11

8   ("Chapter 11") of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy

9   Code"), filed on July 21, 2009 (the "Petition Date"). The Bankruptcy Case initially was pending in

10  the United States Bankruptcy Court for the Central District of California, Riverside Division. On

11  March 29, 2010, the Bankruptcy Case was transferred to the United States Bankruptcy Court for the

12  Central District of California, Los Angeles Division (the "Court"), where it currently is pending.

13  The commencement of the Bankruptcy Case created the chapter 11 bankruptcy estate of VNBC (the

14  "Estate").

15  2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

16  157(a) and 1334(b).

17  3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

18  4.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (C)

19  and (O).

20  5.      This objection to claim, and counterclaim for declaratory relief, which also seeks

21  subordination of those claims, if they are allowed, is properly brought by adversary proceeding

22  pursuant to Fed. R. Bankr. P. 3007(c) and 7008(8) and (9).

23  II.

24  **PARTIES**

25  6.      VNBC is the debtor in possession and has standing to bring the claims alleged herein on

26  behalf of the Estate.

27  7.      Defendant Federal Deposit Insurance Corporation (the "FDIC") is the federal agency

28  charged with, among other duties, administering the Federal Deposit Insurance Act, 12 U.S.C. §§

LANDAU
GOTTFRIED &
BERGER LLP

2

1811, *et seq.*, and the federal bank deposit insurance system established thereunder. As described

below, on January 15, 2010, the FDIC filed a proof of claim (the "FDIC POC") in the Bankruptcy

Case in its capacity as the receiver of Vineyard Bank National Association (the "Bank"), VNBC's

wholly-owned bank subsidiary. By this Complaint, VNBC sues the FDIC in its corporate capacity

as an insurer of deposits and in its capacity as the Receiver of the Bank. This adversary proceeding,

among other things, requests that the Court disallow or, to the extent it is allowed, subordinate the

FDIC POC.

**III.**

**FACTUAL ALLEGATIONS**

**A.    BACKGROUND: REGULATORY OVERSIGHT OF VNBC AND THE BANK AND**

**EVENTS LEADING TO COMMENCEMENT OF VNBC'S BANKRUPTCY CASE.**

8.        Beginning in 2007, a sharp deterioration of national economic conditions, and more

particularly, the Southern California real estate market, caused the Bank to suffer substantial losses

in its loan portfolio. In September 2007, the then Board of Directors of VNBC and the Bank

instructed management to re-evaluate and recommend actions deemed necessary or advisable to

adjust VNBC's and the Bank's overall risk profile, with the result that a Risk Mitigation Plan was

developed that focused on reducing certain loan concentration limits, tightening loan underwriting

standards, enhancing ALL and risk grading policies and procedures, and further addressed other

areas of enterprise risk.

9.        In its Form 10-K filed with the Securities and Exchange Commission on May 19, 2008,

VNBC reported that on May 5, 2008 (the "May 5, 2008 Notice") the Bank was notified by its

primary regulator, the Office of the Comptroller of the Currency ("OCC"), that the Bank was

deemed to be in "troubled condition" and that on May 16, 2008 (the "May 16, 2008 Notice") VNBC

was notified by its primary regulator, the Board of Governors of the Federal Reserve System (the

"Reserve Bank") that VNBC was deemed in "troubled condition" and that VNBC was required by

Reserve Bank policy to take all actions necessary to ensure that its assets were conserved for the sole

benefit of the Bank.

10.        On July 22, 2008, the Bank consented to the issuance of a Consent Order (the "Consent

1   Order") by the OCC. Pursuant to the Consent Order, the Bank agreed to, among other things, (i)

2   seek to obtain more competent management; (ii) maintain certain capital levels; (iii) develop,

3   implement and adhere to a three-year capital program; (iv) establish a program for the maintenance

4   of appropriate loss allowances; (v) adopt, implement and adhere to an acceptable asset

5   diversification program; (vi) revise and adhere to certain loan underwriting guidelines; and (vii) take

6   steps to maintain its liquidity at a level sufficient to sustain its then current operations.

7   11.      On July 15 and 29, 2008, VNBC submitted to the Reserve Bank cash flow projections

8   and a request to pay certain expenses in the amount of $858,234 relating to investor due diligence,

9   proxy and regulatory matters (the "July 2008 Transfers"). The Reserve Bank did not object to that

10  request (i.e., it approved the request) because the payments were intended to benefit the Bank

11  through capital restoration efforts and were critical for the ongoing solvency of VNBC, but also

12  required that management perform an analysis of the cash needs for VNBC through October 31,

13  2008 and that any amounts not required for VNBC's operations be contributed to the Bank to

14  support its operational needs.

15  12.      On September 19, 2008, VNBC reported to the Reserve Bank on its efforts to improve

16  the Bank's condition. Among other things, VNBC reported that (i) it was attempting to raise $250

17  million in equity capital; (ii) of the seven seats constituting the board, five new members and two

18  incumbent members had recently been elected to VNBC's board of directors; (iii) VNBC had four

19  directors who were community bankers with years of experience in the industry and significant

20  turnaround experience; (iv) VNBC and the Bank had appointed a new chief executive officer and the

21  Bank had appointed a new Executive Vice President/Chief Credit Officer who also was Executive

22  Vice President/Chief Risk Officer of VNBC; and (v) VNBC had engaged professionals to assist it in

23  restructuring its balance sheet, raising equity capital and liquidating portions of the Bank's loan

24  portfolio.

25  13.      On September 23, 2008, VNBC executed and thereafter delivered to the Reserve Bank a

26  written agreement (the "Written Agreement") in which VNBC agreed, among other things, (i) not to

27  declare or pay any dividends or make any distributions; (ii) not to take any payments representing a

28  reduction in capital from the Bank; (iii) not to incur, increase or guarantee any debt or purchase or

LANDAU
GOTTFRIED &
BERGER LLP

4

1   redeem any of its shares of stock; (iv) within 60 days, to submit an acceptable written plan to

2   maintain a sufficient capital position for VNBC and the Bank; (v) to comply with, and require the

3   Bank to comply with, certain regulations pertaining to transactions between VNBC, non-banking

4   affiliates and the Bank; and (vi) to comply with certain requirements and restrictions pertaining to

5   appointing directors or officers, changing the responsibilities of senior executives and restrictions on

6   the indemnification of and severance payments to such persons.  This agreement also expressly

7   called for the Reserve Bank to approve the capital plan that was to be submitted by VNBC.

8       14.       On September 23, 2008, in order to comply with, among other things, the prohibitions

9   contained in the Written Agreement against distributions and the purchase or redemption of any of

10  its shares of stock, VNBC sent to the Reserve Bank a request for authorization to issue, pursuant to a

11  private placement memorandum dated September 18, 2008, up to $250 million in investment units

12  consisting of convertible notes and common stock, with approximately $39.1 million of the proceeds

13  to be used to retire, at a significant discount, certain debt and preferred stock of VNBC and at least

14  $100 million of the proceeds to be down-streamed to the Bank as additional capital.  The Reserve

15  Bank did not object to this request.

16      15.       In or about November 2008, the OCC and the FDIC each had field examiners in the

17  offices of VNBC and the Bank on a full time basis who, at their request, had access to the books and

18  records of VNBC and the Bank and other information concerning VNBC's ongoing efforts to either

19  obtain additional capital for the Bank or sell the Bank.

20      16.       On December 31, 2008, the Bank provided a report to the OCC on its efforts to comply

21  with various elements of the Consent Order, including problem loan resolution and liquidity.  It also

22  reported that (i) efforts to raise outside capital of $250 million through a private placement had not

23  been successful and were no longer considered a viable option; (ii) after consultation with VNBC

24  and outside professionals, the sale of the Bank would be pursued; and (iii) VNBC had entered into

25  an agreement for the sale of the Bank pursuant to which, among other things, the prospective buyer

26  proposed to raise additional capital, of which approximately $100 million would be down-streamed

27  into the Bank.

28      17.        On February 26, 2009, the Bank again reported to the OCC on its efforts to comply with

LANDAU
GOTTFRIED &
BERGER LLP

1   the Consent Order and to raise additional capital for the Bank.

2   18.       Also in February 2009, VNBC notified the Reserve Bank that it would, and on February

3   27, 2009 it did, transfer $1 million of VNBC's funds to the Bank (the "February 2009 Transfer"),

4   consistent with Reserve Bank guidance that VNBC was expected to regularly reassess its cash

5   resources and downstream any excess funds to support the Bank's ongoing viability.

6   19.       On April 30, 2009, the Bank became subject to certain mandatory requirements,

7   including the requirement that it submit an acceptable "Capital Restoration Plan" by May 18, 2009.

8   20.       By early May 2009, the agencies with regulatory control over the Bank and VNBC knew,

9   or reasonably should have known, that the Bank was significantly undercapitalized and that there

10  were no realistic scenarios in which the Bank or its parent holding company can raise sufficient

11  capital to achieve adequately capitalized status within any realistic and satisfactory timeframe of an

12  acceptable capital restoration plan."

13  21.       On July 17, 2009, the OCC closed the Bank, seizing control of its books, records and

14  other papers, and appointed the FDIC as receiver.  On that same date, the FDIC facilitated the

15  acquisition of most of the assets and liabilities of the Bank by California Bank & Trust ("CB&T")

16  22.       On July 21, 2009 (the "Petition Date"), VNBC filed its petition for relief under chapter

17  11 of the Bankruptcy Code.

18  **B.   REGULATORS CONTROL OF VNBC AND THE BANK.**

19  23.       At all times from and after not later than May 5, 2008, the OCC and the FDIC had the

20  power to exercise control over the Bank and thus were insiders, within the meaning of 11 U.S.C. §

21  101(31)(B), of the Bank and, in that capacity, had the power to exercise control over the Bank's

22  holding company parent, VNBC.  Moreover, at all times from and after not later than May 15, 2008,

23  the Reserve Bank and the FDIC had the power to exercise control over VNBC and thus were

24  insiders, within the meaning of 11 U.S.C. § 101(31)(B), of VNBC.

25  24.       Beginning in May 2008 and continuing until the Petition Date VNBC transferred at least

26  $1,000,000 in funds to the Bank, including the February 2009 Transfer (collectively, the

27  "VNBC/Bank Transfers") that were intended to benefit and did benefit the Bank and/or the FDIC

28  and ultimately depleted VNBC's estate in the Bankruptcy Case.  VNBC currently is not able to

LANDAU
GOTTFRIED &
BERGER LLP

6