FILED & ENTERED

MAY 03 2013

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gae          DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>VINEYARD NATIONAL BANCORP,<br><br>          Debtor. | Case No.: 2:10-BK-21661RN<br><br>Chapter 11 |
| BRADLEY SHARP, AS LIQUIDATING TRUSTEE OF THE LIQUIDATING TRUST OF VINEYARD NATIONAL BANCORP,<br><br>          Plaintiff and Counter-Defendant,<br><br>     v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as receiver for Vineyard Bank, National Association,<br><br>          Defendant and Counter-Plaintiff. | Adv. No.: 2:10-AP-01815RN<br><br>**MEMORANDUM OF DECISION RE: (1) MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR VINEYARD BANK, N.A., TO DISMISS COUNT IV OF THE ADVERSARY COMPLAINT; AND (2) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO (I) CAPITAL MAINTENANCE CLAIM ASSERTED BY FDIC-R; AND (II) OWNERSHIP OF TAX REFUNDS**<br><br>DATE:    April 16, 2013<br>TIME:    2:00 p.m.<br>PLACE:   Courtroom 1645 |

**INTRODUCTION**

Before the Court are two motions that were filed in connection with the above referenced adversary proceeding: (i) Motion Of The Federal Deposit Insurance Corporation, As Receiver For Vineyard Bank, N.A., to Dismiss Count IV of the Adversary Complaint ("Dismissal Motion"); and (ii) Plaintiff's Motion For Partial Summary Judgment as to (1) Capital Maintenance Claim Asserted by FDIC-R; and (2) Ownership Of Tax Refunds ("MSJ").  The parties have fully briefed and orally argued both motions.  All pleadings were filed under seal.

Rolf Woolner and Gregory Martin of Winston & Strawn LLP appeared on behalf of the Plaintiff and Liquidating Trustee Bradley Sharp ("Liquidating Trustee" or "Plaintiff") and Joshua Wayser and Jessica Mickelsen of Katten Muchin Rosenman LLP appeared on behalf of the Defendant and Cross-Plaintiff FDIC-R ("Defendant" or "FDIC-R").  Linda Berberian of the FDIC also appeared at the hearing.

Because the MSJ addresses two distinct issues, one that invokes subject matter jurisdiction and the other, the alleged lack thereof, the motion will be bifurcated so that the issue with respect to ownership of the tax refund will be addressed together with the subject matter jurisdiction issue raised in the Dismissal Motion while the issues with respect to the allowance of the capital maintenance claim will be addressed separately.  This memorandum of decision addresses the Dismissal Motion and the related MSJ concerning the 2008 tax refunds.

**FACTUAL ALLEGATIONS**

The adversary proceeding was filed on May 5, 2010. The Complaint raises five claims for relief. It seeks to disallow the claim of Defendant and Cross-Plaintiff FDIC-R ("Defendant" or "FDIC-R") against the estate or the Debtor Vineyard National Bancorp ("Debtor") or, alternatively, to subordinate the claim based on allegations that FDIC-R, as receiver for Vineyard Bank, N.A. ("Bank"), was an insider which caused the diminution of Debtor's capital by requiring the Debtor to infuse at least $1 million to the Bank between May 2008 and February 2009 for the Bank's benefit alone. (Compl. ¶¶ 23-29.) The Complaint further avers the Debtor's estate is entitled to certain tax refunds resulting from the Debtor and the Bank's Corporate Income Tax Sharing Agreement dated as of January 3, 2007 ("Tax Sharing Agreement" or "TSA") and to insurance proceeds and premium refunds relating to certain directors and officers' liability insurance.[1] (Compl. ¶¶ 50-66.)

On January 4, 2011, FDIC-R filed its Amended Counterclaim and Answer ("Am. Counterclaim") to the Complaint. The Am. Counterclaim alleges that the FDIC-R, and not the Debtor, is entitled to any tax refund resulting from the Debtor and the Bank's consolidated tax returns. (Am. Countercl. ¶¶ 5-14.) The Am. Counterclaim further alleges that the tax refund is property of the FDIC-R and does not merely create an unsecured claim against the Debtor's estate. Id. ¶ 13. At the same time, the Am. Counterclaim contends that the Joint Plan of Liquidation of the Debtor and the Official Committee of Unsecured Creditors as of August 6, 2010 ("Confirmed Plan") did not

---

[1] It appears that by order entered on July 29, 2011, the parties settled the claim against the insurance proceeds pursuant to a global settlement reached in the D&O litigation and the insurance carriers involved in the case.

provide for the assumption of the Tax Sharing Agreement thereby resulting in its rejection and its inapplicability in this case.[2] Id. ¶¶ 8 and 13.

Furthermore, the Am. Counterclaim seeks damages in the amount of $579 million that the FDIC-R claims is entitled to priority under § 507(a)(9) as a result of the Debtor's failure to maintain sufficient capitalization for the Bank based on its statutory and regulatory obligations to the Bank (the "Capital Maintenance Claim"). (Am. Countercl. ¶ 17.) The Am. Counterclaim also claims fraudulent transfers for the Bank's unlawful dividend payments to Debtor's directors and officers and for payments to some of the Debtor's vendors. Id. ¶ 21. In connection therewith, the FDIC-R claims rights to insurance proceeds and premium reimbursements. Id. ¶¶ 22-24; supra.

The Dismissal Motion is sought pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1) made applicable in bankruptcy under Federal Rule of Bankruptcy Procedure ("FRBP") 7012(b) for lack of subject matter jurisdiction. The Dismissal Motion argues that because FDIC-R is entitled to the tax refund[3], Plaintiff and Liquidating Trustee Bradley Sharp's ("Liquidating Trustee" or "Plaintiff") claim against the FDIC-R for the tax refund is governed by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") which denies jurisdiction to any court in favor of the administrative procedure under FIRREA to decide claims against the FDIC-R.

---

[2] The joint plan was confirmed on August 26, 2010.

[3] The tax refund at stake is approximately $21,865.014.

4

Plaintiff filed his amended opposition ("Opposition") to the Dismissal Motion on or about January 3, 2013. The Opposition asserts that (i) the filing of FDIC-R's proof of claim subjects the FDIC-R to this Court's jurisdiction; (ii) the bankruptcy court has jurisdiction to determine the assets of a debtor's estate; and (iii) Debtor is a debtor of the Bank and not a creditor that is required to file a claim under FIRREA.

According to the Reply ("Dismissal Reply"), whether the Court has subject matter jurisdiction in this case is at the core of the issue. The Dismissal Reply contends that the Plaintiff invokes the incorrect framework for deciding this adversary proceeding by conflating the application of 11 U.S.C. § 541 with the jurisdiction issue raised by FIRREA and that this adversary proceeding impermissibly circumvents the administrative claims process under FIRREA.

Related to the Dismissal Motion is the Plaintiff's MSJ on the issue of ownership of the tax refund. Plaintiff argues that interpreting the terms of the Tax Sharing Agreement is at the crux of the dispute. Based on Plaintiff's interpretation, the terms of the TSA created a debtor-creditor relationship between the Debtor and the Bank whereby the Bank is a creditor of the Debtor (and now, of its estate). MSJ at 2. The MSJ urges the Court to find that the TSA created a contractual obligation giving rise to a debtor-creditor relationship and not a trust or an agency agreement whereby Debtor holds the tax refund in trust for the Bank's benefit.

The opposition to the MSJ ("MSJ Opp'n") argues that there are genuine issues of material fact to decide (i) whether there is a Tax Sharing Agreement that governs the 2008 tax refunds; and (ii)

whether the Bank owned the tax refunds because it paid the taxes and incurred the tax liability and the loss that resulted in the refunds.

The reply ("MSJ Reply") asserts there are no issues of material fact. The Tax Sharing Agreement applies to the 2008 tax return, Defendant does not own the refund, and the agreement did not create an agency relationship between the Debtor and the Bank.

### DISCUSSION

In view of the Dismissal Motion and the MSJ, the Court will treat the Defendant's Dismissal Motion as a motion for summary judgment. Notwithstanding that the Dismissal Motion was sought under FRCP 12(b)(1), the treatment is permissible under case law. As stated in Lawrence v. Dunbar, 919 F.2d 1525, 1530 (11th Cir. 1990), when the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction.

Factual attacks on subject matter jurisdiction focus not on the pleadings but on the existence of subject matter jurisdiction "in fact." Provenzano v. United States, 123 F. Supp. 2d 554, 557 (S.D. Cal. 2000). In resolving factual attacks, the court may consider matters outside the pleadings, such as affidavits and testimony. See Roberts v. Corrothers, 812 F.2d 1173 (9th Cir. 1987); see also Lawrence v. Dunbar, 919 F.2d at 1529. As such, the summary judgment standard will be adopted in evaluating Rule 12(b)(1) motions that also implicate the merits of a claim. Lawrence v. Dunbar, 919 F.2d

at 1530.    The issue of subject matter jurisdiction is sufficiently intertwined with the factual issues of this case.

FRCP 56 requires the entry of summary judgment if "the movant shows that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law.    The court should state on the record the reasons for granting or denying the motion."    FRBP 7056 makes FRCP 56 applicable in this proceeding.

The U.S. Supreme Court instructs "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510 (1986).    The requirement is that there be no genuine issue of material fact.    Id. at 248, 106 S.Ct. at 2510.    An issue is "genuine" only if there is sufficient evidentiary basis on which a reasonable trier of fact could find for the nonmoving party.    Id.    A factual dispute is "material" only if it might affect the outcome of the suit and under the governing law will properly preclude the entry of summary judgment.    Id.    Factual disputes that are irrelevant or unnecessary will not be counted.    Id.    At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine factual dispute for trial.    Anderson, 7 U.S. at 249; 106 S.Ct. at 2510.

Under Rule 56, the Movant bears the initial burden to show that no material issue of fact exists.    Once the Movant demonstrates from the record that there are no genuine disputes of material fact, the burden of proof shifts to the party opposing summary judgment.    10 COLLIER ¶ 7056.05; Coral Petroleum, Inc. v. Baque Pribas-London, et

*al.*, 797 F.2d 1351, 1354 (5th Cir. 1986).  The court must view the evidence in a light most favorable to the nonmoving party.  <u>Coral Petroleum, Inc.,</u> 797 F.2d at 1354.  Any doubt as to the existence of genuine issues of fact will be resolved against the moving party.  10 COLLIER, ¶ 7056.05.  Additionally, Local Bankruptcy Rule 7056-1(f) states:

> "[I]n determining any motion for summary judgment or partial summary adjudication, the court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such facts are (1) included in the "statement of genuine issues" and (2) controverted by declaration or other evidence filed in opposition to the motion."

The crux of the dispute is the interpretation of the Tax Sharing Agreement between the Debtor and the Bank and the facts surrounding this agreement to the extent that there are ambiguities in the agreement's language.  Interpreting the terms of the agreement is essential in establishing whether the Bank, and therefore, the Defendant, owns the tax refund.

Accordingly, the rules of construction in interpreting contracts are essential in deciding the issue at hand.  Fundamental in contract interpretation is the examination of the plain language within the four corners of the contract to determine the mutual intent of the contracting parties.  <u>United States v. Westlands Water Dist</u>., 134 F. Supp. 2d 1111, 1134 (E.D. Cal. 2001) (citation omitted).  A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations.  <u>Westlands Water Dist</u>., 134 F. Supp. 2d

at 1135 citing <u>Klamath Water Users Protective Ass'n v. Patterson</u>, 204 F.3d 1206, 1210 (9th Cir.), *cert. denied*, 531 U.S. 812, 148 L. Ed. 2d 14, 121 S. Ct. 44 (2000) (add'l citations omitted).  Courts must interpret contracts, if possible, so as to avoid internal conflict.  <u>Westlands Water Dist</u>., 134 F. Supp. 2d at 1135 citing <u>Trident Ctr. v. Conn. Gen. Life Ins. Co</u>., 847 F.2d 564, 566 (9th Cir. 1988) (citing sources).

"'A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation.  The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous.'" <u>Westlands Water Dist</u>., 134 F. Supp. 2d at 1135 *citing* <u>Barcellos & Wolfsen v. Westlands Water Dist.</u>, 849 F. Supp. 717, 721 (E.D. Cal. 1993).  "The determination whether a contract's language is ambiguous is a question of law." <u>Westlands Water Dist</u>., 134 F. Supp. 2d at 1135 (citations omitted). Consequently, under the parol evidence rule, a court does not look to 'extrinsic evidence to interpret the terms of an unambiguous written instrument.'" <u>Id</u>. (citations omitted).  In California, extrinsic evidence is admissible to explain the meaning of a contract if the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible." <u>Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.</u>, 69 Cal.2d 33, 37 (1968).[4]

---

[4]   While the Ninth Circuit in <u>Trident Ctr. v. Connecticut Gen. Life Ins. Co.</u>, 847 F.2d 564, 569-570 (9th Cir. Cal. 1988) questioned the wisdom of <u>Pacific Gas,</u> it found that it is bound by such a holding in interpreting contracts in California.

**A.   Subject Matter Jurisdiction**

Defendant contends the bankruptcy court has no jurisdiction to hear and decide the Plaintiff's claim regarding the entitlement to and ownership of the tax refund because the Debtor failed to comply with the administrative procedures under FIRREA that required the Debtor to file a claim against the FDIC-R and the Bank's receivership estate by the bar date of October 21, 2009 before the Plaintiff could commence litigation against the FDIC-R. (Mot. Dismiss at 2-3.)

The parties do not dispute that 12 U.S.C. § 1821(d) governs the determination of claims against the Bank controlled by the FDIC. Section 1821(d) sets out the administrative procedure that must be followed to determine claims against the FDIC-R. However, parties disagree on whether § 1821(d) applies in this adversary proceeding.

On the one hand, Defendant argues Plaintiff failed to file a claim by the October 21, 2009 deadline for filing claims against the Bank's receivership estate. (Mot. Dismiss at 7-8; Decl. of Lewis Nelson, Sr. in Supp. Of Def.'s Mot. to Dismiss ¶7.) Hence, Plaintiff is barred from making a claim of entitlement against the tax refund which the Defendant asserts the Bank owns. *See* 12 U.S.C. § 1821(d)(5)(C).[5]

Conversely, Plaintiff asserts the Debtor was not required to file a claim against the Bank for the tax refund because it does not have a claim against the Bank. Instead, it is a debtor of the Bank with respect to the tax refund because the Tax Sharing Agreement

---

[5] Section 1821(d)(5)(C) provides unless claimant was unaware of the appointment of the receiver in time to file a proof of claim by the deadline date and files a proof of claim before claim payments are made, "claims filed after the [claims deadline] shall be disallowed and such disallowance shall be final."

created a debtor-creditor relationship whereby the Debtor would owe the Bank for any tax refund to the consolidated group on account of its consolidated tax return based on the amount the Bank would have received if it were to file its own tax return.  (Opp'n at 5-7.)

As Defendant established, sweeping case law from all circuits holds that courts (federal or otherwise) lack jurisdiction over claims asserted against the FDIC in its capacity as receiver prior to the exhaustion of the administrative claims process.  (Mot. Dismiss at 9-10); *see e.g.*, <u>Henderson v. Bank of New England</u>, 986 F.2d 319, 320 (9th Cir. 1993) (Section 1821(d)(13)(D) strips all courts of jurisdiction over claims made outside the administrative procedures of § 1821.)

However, this general rule is limited only to claims against the failed bank's receivership.  <u>Parker N. Am. Corp. v. Resolution Trust Corp. (In re Parker N. Am. Corp.)</u>, 24 F.3d 1145 (9th Cir. 1993); <u>McCarthy v. FDIC</u>, 348 F.3d 1075, 1078-80 (9th Cir. 2003)[6].  As <u>Parker</u> explained, a "claim" under FIRREA means an obligation owed by the failed institution, and not an obligation owing to it.  24 F.3d at 1153.

More importantly, <u>Parker</u> concluded that FIRREA's administrative claims exhaustion requirement is not invoked at the stage where the court is determining whether the *res* in question is an "asset" of the failed banking institution.  24 F.3d at 1153.  It follows, therefore, that the issue of whether the tax refund is an asset of the FDIC-R or the Debtor is outside the ambit of FIRREA

---

[6] <u>McCarthy</u> limited the application of <u>Parker</u> on two points holding instead: (1) that Parker is limited to bankruptcy cases; and (2) the claims administrative process under FIRREA apply not only to claims of creditors against the receivership but also claims of debtors in chapter 11 against the failed banking institution.  However, it did not overrule its holding that FIRREA procedures are limited only to claims.

under § 1821(d)(13)(D)(i) which bars judicial review of an "action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver. . . ."

Defendant unsuccessfully attempts to persuade this Court to deviate from the Ninth Circuit's holding in Parker by citing to In re American Mortg. & Inv. Servs., 141 B.R. 578, 583 (Bankr.D.N.J. 1992), for the proposition that FIRREA's administrative claims procedure is the proper forum to resolve issues concerning the FDIC-R's ownership interest in the tax refunds. First, Parker is controlling in the circuit and has not been overruled. American Mortgage was decided by the New Jersey bankruptcy court and is not binding on this Court. Second, the Court finds American Mortgage unpersuasive because its application of FIRREA was overreaching based on the two cases it relied upon: Capital Data Corp. v. Capital Nat. Bank, 778 F.Supp. 669 (S.D.N.Y. 1991) and Resolution Trust Corp. v. Elman, 761 F.Supp. 245(2d Cir. 1991). Capital Data Corp. involved the validity of a secured creditor's lien on the failed bank's stock while Elman involved the claim of the failed bank's former attorney against the bank's estate. American Mortg., 141 B.R. at 583. American Mortgage, however, involved a secured creditor who sought to execute on its collateral against a bankruptcy debtor's asset to which the FDIC, as receiver for the debtor's subsidiary, claimed ownership. 141 B.R. at 580. American Mortgage did not involve a direct claim against the FDIC unlike Elman and Capital Data Corp. which involved direct claims against the FDIC as receiver. The dispute in American Mortgage was outside the purview of § 1821(d)(13) as set forth in Parker.

This manner of interpreting the confines of § 1821(d)(13)(D) was applied in Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B., 28 F.3d 376, 385 (3d Cir. 1994) where the Third Circuit established first that the insurance policies in question were assets of the failed bank.  Having concluded that the insurance policies were assets of the failed bank, it determined that the jurisdictional bar contained in § 1821(d)(13)(D) applied.  Id.

The Court finds FIRREA and the Bankruptcy Code can coexist in the context of a chapter 11 debtor so that FIRREA only limits the bankruptcy court's jurisdiction involving claims against the FDIC-R that are "susceptible of resolution through [FIRREA's] claims procedure." Henderson, 986 F.2d at 321.  Here, the Court finds that FIRREA's limitation under § 1821(d) does not extend to controversies between the Debtor and the FDIC-R involving the threshold issue of ownership of an asset.  The threshold question must be overcome first before § 1821(d)(13) is applied.

As the Ninth Circuit explained in McCarthy,

> "if bankruptcy courts are stripped of
> jurisdiction over a broad class of claims under
> the § 1821(d) jurisdictional bar, the unity of
> the bankruptcy process may be fractured and some
> bankruptcy-related claims would be determined, at
> least in the first instance, by FDIC
> administrative tribunals, which (it is argued)
> have little expertise in bankruptcy matters.  For
> the reasons stated above, we do not think this
> construction of the § 1821(d)(13)(D)
> jurisdictional bar quite squares with the
> statutory text." 348 F.3d at 1079 citing Freeman
> v. FDIC, 312 U.S. App. D.C. 324, 56 F.3d 1394,
> 1401-02 (D.C. Cir. 1995).

Undoubtedly, "determining the nature and extent of property of the estate is a fundamental function of a bankruptcy court.... [and] fundamental to the administration of a bankruptcy case" thus, establishing a core proceeding under 28 U.S.C. § 157(b)(2)(A).  In re Kincaid, 917 F.2d 1162, 1165 (9th Cir. 1990) *adopting the holding in* In re Kincaid, 96 B.R. 1014, 1017 (9th Cir. BAP 1989).

The Court rejects the FDIC-R's position that this court lacks subject matter jurisdiction.  To exercise this Court's fundamental function requires its determination of the Debtor's assets including its ownership interest in the tax refund.

The FDIC-R's reference to the Indymac opinions and the courts' findings that the interpretation of a tax sharing agreement is not a core proceeding under Stern v. Marshall, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011) reh'g denied, 132 S. Ct. 56, 180 L. Ed. 2d 924 (U.S. 2011), is not dispositive because it simply requires the Court, if the parties do not consent to the Court's jurisdiction to render a final decision on the issue, to submit proposed findings of fact and conclusions of law to the district court pursuant to 28 U.S.C. § 157(c)(1).  *See* Siegel v. FDIC (In re IndyMac Bancorp Inc.), 2012 LEXIS 1462 *3-4 (Bankr. C.D. Cal. Mar. 29, 2012) as accepted by In re IndyMac Bancorp, Inc., 2012 LEXIS 88666 *13-17 (C.D. Cal. May 30, 2012) (issuing proposed findings of fact and conclusions of law on similar issues as this case in response to the district court's finding in Siegel v. FDIC (In re IndyMac Bancorp Inc.), 2011 U.S. Dist. LEXIS 78418 (C.D. Cal. July 15, 2011) that the issues involved non-core issues.)  The approach is consistent with Judge Real's Order Denying Motion of the Federal Deposit Insurance Corporation, as Receiver for Vineyard Bank, N.A., for the Entry of an Order

Withdrawing Reference of Adversary Proceeding of April 11, 2011.  It does not strip the federal courts of jurisdiction to hear the issue, in the first instance, in favor of the administrative procedure set forth under 12 U.S.C. § 1821(d)(13).

**B.   Applicable Law**

A significant amount of case law has emerged in determining ownership of tax refunds between parents and their subsidiaries arising from consolidated tax returns filed on behalf of the group. As such, this court will not replicate the extensive legal analyses that have been written on this issue that benefits us all.  Instead, this opinion attempts to succinctly address issues presented in this case in the context of precedence in this circuit and the majority of cases that have addressed the same dispute presented to this Court.

The Ninth Circuit case of Bob Richards Chrysler-Plymouth Corp., 473 F.3d 262 (9th Cir. 1973) established that in the absence of a written agreement expressly stating the rights and obligations of parties filing a consolidated tax return, a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.  473 F.2d at 265.  As a result, the party receives the refund from the government only in its capacity as an "agent" for the consolidated group.  Id.  The absence of an express or implied agreement that the agent had any right to keep the refund meant the agent was under a duty to return the tax refund to the party that incurred the loss. Id.

Accordingly, if an express written agreement is in effect, such an agreement controls the disposition of the tax refund. Several cases comport with this principle. <u>In re NetBank, Inc</u>., 459 B.R. 801, 809 (Bankr. M.D. Fla. 2010); <u>In re BankUnited Financial Corp., et al.</u>, 462 B.R. 885, 899 (Bankr. S.D. Fla. 2011); <u>In re Team Financial, Inc</u>., 2010 WL 1730681 *4-5, *10-11 (Bankr. D. Kan. Apr. 27, 2010); and <u>Siegel v. FDIC (In re IndyMac Bancorp Inc.)</u>, 2012 LEXIS 1462 *3-4 (Bankr. C.D. Cal. Mar. 29, 2012) as accepted by <u>In re IndyMac Bancorp, Inc</u>., 2012 LEXIS 88666 *13-17 (C.D. Cal. May 30, 2012). While these cases are not binding on this Court,[7] this Court finds their reasoning to be sound and of persuasive value to the controversy before it.

To that extent, the Court must look at the four corners of the TSA to determine whether the agreement created an agency or a debtor-creditor relationship between the Debtor and the Bank. Unless the TSA is ambiguous, extrinsic evidence will not be considered.

C.   **<u>The absence of a written TSA for the tax year 2008 creates a genuine dispute of material fact.</u>**

In this case, it is uncontroverted that the Tax Sharing Agreement was first created in January 2005 as reflected in the minutes of both boards. (Statement of Uncontroverted Fact ("<u>SUF</u>") ¶ 12.) Identical versions of the Tax Sharing Agreement were signed by the President/CEO (Norman Morales) and Executive Vice President/CFO

---

[7] <u>In re Silverman</u>, 616 F.3d 1001, 1005 (9th Cir. 2010). Furthermore, Defendant failed to demonstrate that a decision lacks force merely because it is on appeal. Unless overruled by the appellate court, the cases remain relevant to this Court's decision.

(Gordon Fong) of both the Bank and the Debtor in 2006 and 2007. (SUF ¶ 13.)  The TSA provided in pertinent part:

> "[T]he ultimate responsibility to make timely estimated federal income and state franchise tax payments rests with the Company [Debtor].  It has been the policy and practice of both the Company and the Bank to have the Bank make the timely quarterly consolidated estimated Federal income and state franchise tax payments on behalf of both the Company and the Bank to the taxing authorities.
> . . .
> Each quarterly amount advanced or deducted by the Bank on behalf of the Company will appropriate the estimated Federal income and state franchise tax liability or benefit calculated by multiplying the quarterly taxable income/loss of the Company by the appropriate income tax rate. These tax remittances shall not exceed the amount the Bank would have paid had it filed separately. *The Bank and Bancorp shall settle intercompany taxes receivable/payable arising from these estimated payments on a quarterly basis.  Thus, if the Bank incurs a tax loss it should receive a refund in an amount no less than the amount the Bank would have received as a separate entity, regardless of whether the consolidated group is receiving a refund."* (App. of Ex. Supp. of Pl.'s Summ. J., Ex. 9 (emphasis added).)

The TSA has no termination clause or provision that makes it effective beyond the year that it was signed.  Indeed, the practice since its inception was to sign or renew the same TSA every year. It is also uncontroverted that there was no TSA signed for 2008—the tax year corresponding to the return that caused the disputed tax refund.  However, it is also uncontroverted that the Debtor and the Bank filed consolidated tax returns for the years 2003, 2004 and 2008 notwithstanding the absence of a written TSA for 2008 and the years preceding 2005.  (SUF ¶ 17).

The parties dispute that the Tax Sharing Agreement was operative in 2008. Consequently, the facts of Team Financial NetBank, BankUnited Financial, and IndyMac do not fit squarely with the facts of this case to the extent that in those cases, a written tax allocation agreement was clearly in effect during the tax year that resulted in a refund. If it was in effect, absent ambiguity, the analysis is relatively simple as thisCourt does not find the terms of the TSA to be vague to allow extrinsic evidence of the parties' intent with respect to its terms. The problem lies with the fact that there was no TSA signed in 2008. This fact distinguishes the case from the majority of cases that clearly have an enforceable TSA at the time the returns were filed. As such, the probe does not end with reviewing the parties' Tax Sharing Agreement.

Plaintiff urges this Court to find that a written TSA existed in 2008 by extrapolating the effectiveness of the existing TSA for 2005, 2006 and 2007 despite not being signed in 2008. This is based on the argument that the TSA did not have an expiration provision and no requirement that it be renewed every year. (MSJ Reply at 14.) There is also nothing in the TSA that states it remains effective until it is expressly terminated by the Debtor and the Bank's boards or by some other means. See e.g., In re Nelco, Ltd., 264 B.R. 790, 799. On the contrary, the undisputed evidence shows the parties signed a new TSA every year for three years since it was formulated.

Plaintiff argues that the most logical inference is that TSA's effectiveness would continue until the policy for filing consolidated tax returns was changed by the boards of the Bank and

the Debtor.  (MSJ Reply at 15.)  However, it is equally logical to conclude that the parties decided not to continue with the terms of the existing TSA for 2008 as illustrated by the Debtor's failure to seek board approval and their continuing practice of filing consolidated tax returns.  The board minutes that approved the TSA did not indicate that board approval was necessary to terminate the agreement.  (App. of Ex. Supp. of Pl.'s Summ. J., Ex. 10.) Likewise, it is uncontroverted that the parties filed consolidated tax returns for 2003 and 2004 without the use of a written TSA that governed the rights of the parties at that time.  (SUF ¶ 17.)

Because there exists an ambiguity as to whether the written TSA remained in effect for 2008, it appears appropriate for this Court to look at the extrinsic evidence to determine (1) the intent of the Debtor and the Bank to continue with the terms of the TSA in 2008 without a written agreement; and (2) whether the principles of Bob Richards apply in this case in the absence of a signed Tax Sharing Agreement for 2008.

In the Declaration of James LeSieur[8] filed in support of the MSJ, he testified that he understood the last Board-approved TSA remained in effect for 2008-09.  (LeSieur Decl. Supp. Mot. Summ. J. ¶ 15.)  As interim CFO in 2008-09, he continued to apply and implement the TSA.[9] [10]  Id.  On the other hand, Gordon Fong's[11]

---

[8]  James LeSieur was the Chairman of the Debtor's Board of Directors from January 2007 to August 2008; the Vice Chairman of the Board of Directors from October 2008 until the Debtor's chapter 11 petition on July 21, 2009; the interim CEO from January 2008 until the fall 2008 when Glenn Terry because the official CEO; interim CFO from December until the postpetition period of the Debtor's bankruptcy case.  He held the same positions with the Bank during the same time he was an officer and director of the Debtor.

[9]  LeSieur's deposition testimony was slightly different and less precise.  He answered yes when asked whether he continued to implement and apply the Tax Sharing Agreement as in force "*from time to time*" and not between 2008 and 2009.  (App. of Dep. Supp. of Pl.'s Summ. J., Ex. C, 78-79.)

Declaration in Support of the Opposition states that he understood the tax sharing agreement between the Bank and the Debtor had to be re-signed and approved by the Boards of the Debtor and the Bank each year to be in effect.  (Fong Decl. Supp. Opp'n ¶ 4.)  As a result, in 2006 and 2007, he redrafted the 2005 Tax Sharing Agreement and had the boards of the Debtor and the Bank approve them.  Id. However, there is no evidence of minutes that the boards approved the 2006 and 2007 Tax Sharing Agreements similar to the approval that occurred in 2005.

The Court finds, therefore, that for the terms of the TSA to remain applicable in 2008, the TSA that was executed in 2005 must remain enforceable notwithstanding the absence of a signed TSA in 2008.  Mr. LeSieur's testimony that he understood the last Board-approved TSA remained in effect for 2008-09  negates the Liquidating Trustee's position that it was unnecessary to renew the TSA every year.  (LeSieur Decl. Supp. Mot. Summ. J. ¶ 15.)  Absent an applicable TSA for 2008, the Court finds 12 U.S.C. § 1823(e) prohibits any oral agreements that would diminish or defeat the interest of the FDIC in any asset acquired by it.  See also D'oench, Duhme & Co. v. Federal Deposit Insurance Corp., 315 U.S. 830, 62 S.Ct. 676 (1942).

Whether the TSA was effective in 2008 remains unresolved because no similar TSA was signed by the officers of the Debtor and the Bank existed.  Consequently, the Court finds a material fact

---

[10] The Court overrules the FDIC-R's evidentiary objection to LeSieur's Declaration in Support of the Motion for Summary Judgment as relevant to the issue of whether the parties intended to continue with the existing TSA for 2008. LeSieur's declaration further established his personal knowledge on the issue.

[11] Gordon Fong served as the CFO and Senior VP of the Debtor and the Bank between 2002-08.

remains disputed on whether the 2005 TSA was enforceable in in 2008 or whether a signed written TSA had to be renewed every year for it to be enforceable.  Summary judgment on the issue of entitlement to the 2008 tax refunds, therefore, must be denied.

**CONCLUSION**

For the reasons stated herein, the Court denies Defendant's Dismissal Motion as to Plaintiff's Complaint, Count IV, and denies the Plaintiff's Motion for Partial Summary Judgment on the issue of entitlement to the tax refunds.  A separate judgment shall issue at the conclusion of all issues relating to this adversary proceeding.

###

Date: May 3, 2013

Richard M. Neiter
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*)  **MEMORANDUM OF DECISION RE: (1) MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR VINEYARD BANK, N.A., TO DISMISS COUNT IV OF THE ADVERSARY COMPLAINT; AND (2) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO (I) CAPITAL MAINTENANCE CLAIM ASSERTED BY FDIC-R; AND (II) OWNERSHIP OF TAX REFUNDS** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **May 3, 2013**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

US Trustee's Office (Los Angeles):  ustpregion16.la.ecf@usdoj.gov
Plaintiff's Counsel Gregory A Martin:  gmartin@winston.com; Rolf Woolner:  rwoolner@winston.com
Defendant's Counsel Joshua D Wayser:  joshua.wayser@kattenlaw.com; Jessica Mickelson, Jessica.mickelson@kattenlaw.com;

☐ Service information continued on attached page

**II.    SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

**Defendant's Counsel:**
Linda Berberian
FDIC Legal Division
Dallas Regional Office
1601 Bryan Street
Dallas, TX 75201

☐ Service information continued on attached page

**III.    TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☐ Service information continued on attached page