**FILED & ENTERED**

**MAR 28 2014**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** gae    **DEPUTY CLERK**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>VINEYARD NATIONAL BANCORP,<br><br>        Debtor. | Case No.: 2:10-BK-21661RN<br><br>Chapter 11 |
| BRADLEY SHARP, AS LIQUIDATING TRUSTEE OF THE LIQUIDATING TRUST OF VINEYARD NATIONAL BANCORP,<br><br>        Plaintiff and Counter-Defendant,<br><br>   v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as receiver for Vineyard Bank, National Association,<br><br>        Defendant and Counter-Plaintiff. | Adv. No.: 2:10-AP-01815RN<br><br>**MEMORANDUM OF DECISION AFTER TRIAL ON (i) COUNT IV OF THE COMPLAINT; AND (ii) COUNT I OF THE AMENDED COUNTERCLAIM**<br><br><br>DATE:    January 29, 2014<br>TIME:    9:00 a.m.<br>PLACE:   Courtroom 1645 |

**INTRODUCTION**

Bradley Sharp, as Liquidating Trustee of the Liquidating Trust of Vineyard National Bancorp ("Plaintiff"), commenced this action on May 5, 2010 raising five claims for relief that seek to disallow the

1

claim of Defendant and Counter-Plaintiff FDIC-R ("Defendant" or "FDIC-R"), as receiver for Vineyard Bank, N.A. ("Bank"), against the chapter 11 estate of Vineyard National Bancorp ("Debtor"). Among other things, Count IV of the complaint asserts the Debtor's entitlement to certain tax refunds in connection with the Debtor and the Bank's consolidated tax returns for the tax year 2008.[3] (Compl. ¶¶ 50-66.) With its Amended Counterclaim to the Complaint ("Am. Countercl."), the FDIC-R rejects Plaintiff's position that the FDIC-R is merely an unsecured creditor of the Debtor's estate on account of the Bank's entitlement to the tax refunds and instead, asserts its right to the said tax refunds as property of the FDIC-R. (Am. Countercl. ¶¶ 5-14.)

On May 3, 2013, this Court issued its Memorandum of Decision Re: (1) Motion of the Federal Deposit Insurance Corporation, as Receiver for Vineyard Bank, N.A., to Dismiss Count IV of the Adversary Complaint; and (2) Plaintiff's Motion for Partial Summary Judgment as to (I) Capital Maintenance Claim Asserted by FDIC-R; and (II) Ownership of Tax Refunds ("MOD"). The MOD, *inter alia*, denied Plaintiff's motion for partial summary judgment on the issue concerning the ownership of the 2008 tax refunds finding that a material factual dispute exists on whether an enforceable Tax Sharing Agreement ("TSA") was operative in 2008 and whether a signed TSA had to be renewed every year since 2005 for the agreement to be enforceable. (Mem. Of Decision, May 3, 2013.)

---

[3] The complaint further alleges FDIC-R was instrumental in causing the diminution of Debtor's capital by requiring the Debtor to infuse at least $1 million to the Bank between May 2008 and February 2009 that was intended to benefit the Bank and deplete Debtor's estate. Thus, its claim ought to be subordinated. (Compl. ¶¶ 23-29.)

In Courtroom 1645 of the above entitled Court, the Honorable Richard M. Neiter, United States Bankruptcy Judge presiding, conducted a two-day bench trial on January 29 and 30, 2014. Rolf S. Woolner, Esq. and William R. Shafton, Esq. of Winston & Strawn, LLP appeared on behalf of the Plaintiff and David A. Kettel, Esq. and Jessica Mickelsen, Esq. of Katten Muchin Roseman, LLP appeared on behalf of the Defendant. No other appearances were made.

The admitted facts in the parties' Pretrial Stipulation approved on December 26, 2013 ("Admitted Fact(s)"), the Trial Documents from both parties, the testimony of witnesses and the stipulated exhibits for trial (collectively, "Stipulated Exhibit(s)") admitted into evidence at trial govern the facts of this case.[4] The following witnesses testified at trial:

(1) Mr. Norman Morales[5] ("Morales"),

(2) Mr. James LeSieur[6] ("LeSieur"),

(3) Mr. Gordon Fong[7] ("Fong"),

(4) Mr. Donald Henry Pelgrim, Jr.[8] ("Pelgrim"),

(5) Ms. Jessica Mickelsen ("Mickelsen"),

(6) Mr. Joel Herbert Ravitz ("Ravitz"), and

(7) Mr. Chuck Lawrence Keagle.

---

[4] Defendant's Exhibits Q and DD were excluded from trial while Defendant's Exhibits J, J1, K, L, M, and N were admitted subject to Plaintiff's evidentiary objections.

[5] Mr. Morales was the Debtor's President and CEO until January 2008 when Mr. LeSieur took over the CEO position.

[6] Mr. LeSieur was the Chairman of the Debtor's Board of Directors from January 2007 to August 2008; the Vice Chairman of the Board of Directors from October 2008 until the Debtor's chapter 11 petition on July 21, 2009; the interim CEO from January 2008 until the fall 2008; and interim CFO from December until the postpetition period of the Debtor's bankruptcy case. He held the same positions with the Bank during the same time he was an officer and director of the Debtor until the Bank was taken over by the FDIC-R.

[7] Mr. Fong was the CFO and former Executive Vice President of the Bank and the Debtor.

[8] Mr. Pelgrim was a former chief administrative officer for the Debtor.

Witnesses were cross-examined accordingly.

The Court has carefully considered the Admitted Facts, the findings made in this Court's decision entered on May 3, 2013, the testimonies and all exhibits admitted into evidence. The Court has also considered the legal arguments made in the Plaintiff's Trial Brief, the Trial Brief of the Federal Deposit Insurance Corporation, as Receiver for Vineyard Bank, and the Plaintiff's Reply Trial Brief. After trial, the Court took this matter under submission and now renders its Memorandum of Decision containing its findings of fact and conclusions of law as required under Fed. R. Bankr. P. 7052.

**JURISDICTION**

This Court's jurisdiction is established under 28 U.S.C. §§ 157(b)(2)(B) and 1334, and as determined by this Court's Memorandum of Decision issued on May 3, 2013.

**ISSUES**

The trial focused on the factual issue concerning the intent of the parties to continue enforcing the terms of the TSA in 2008. A factual determination of this issue would result in this Court deciding whether the holding in *In re Bob Richards Chrysler-Plymouth Corp., Inc.*, 473 F.2d 262 (9th Cir. 1973), applies in this case in the absence of a signed TSA applicable in 2008 thereby determining ownership of the 2008 tax refunds.

**STATEMENT OF EVIDENTIARY FACTS**

Debtor is the parent-holding company of the Bank. (Admitted Fact ¶ 1.) The Vineyard National Bancorp and Subsidiary Corporate Income Tax Sharing Agreement (as previously defined, "<u>TSA</u>") between the Bank and the Debtor was created on January 31, 2005 and signed by Mr. Norman Morales as President and Mr. Gordon Fong as Senior Vice President of both the Debtor and the Bank. (*Id*. ¶ 2; Pl. Stipulated Ex. 2 and Def. Stipulated Ex. A.) The respective boards of directors of the Debtor and of the Bank adopted the TSA as reflected in the minutes of the meeting on April 27, 2005. (Admitted Fact ¶ 2; Pl. Stipulated Ex. 3.) Identical versions of the TSA were signed by Mr. Morales and Mr. Fong on behalf of the Bank and the Debtor in 2006 and 2007. (Admitted Fact ¶ 3; Pl. Stipulated Exs. 4 and 5 and Def. Stipulated Ex. A.) However, there were no minutes of either board of directors' meeting reflecting their approval of the TSA signed in 2006 and 2007. (Admitted Fact ¶ 3.)

The TSA provides in pertinent part:

> "[T]he ultimate responsibility to make timely estimated federal income and state franchise tax payments rests with the Company [Debtor]. It has been the policy and practice of both the Company and the Bank to have the Bank make the timely quarterly consolidated estimated Federal income and state franchise tax payments on behalf of both the Company and the Bank to the taxing authorities.
> . . .
> Each quarterly amount advance or deducted by the Bank on behalf of the Company will approximate the estimated Federal income and state franchise tax liability or benefit calculated by multiplying the quarterly taxable income/loss of

>              the Company by the appropriate income tax rate.
>              These tax remittances shall not exceed the amount
>              the Bank would have paid had it filed separately.
>              *The Bank and Bancorp shall settle intercompany
>              taxes receivable/payable arising from these
>              estimated payments on a quarterly basis. Thus,
>              if the Bank incurs a tax loss it should receive a
>              refund in an amount no less than the amount the
>              Bank would have received as a separate entity,
>              regardless of whether the consolidated group is
>              receiving a refund."* (Pl. Stipulated Exs. 2, 4
>              and 5 and Def. Stipulated Ex. A (emphasis
>              added).)

There was no TSA signed in 2008—the tax year that resulted in the disputed tax refunds. (Admitted Fact ¶ 3.)

**A.  A written Tax Sharing Agreement existed in 2008.**

The collective testimonies from the directors and officers of the Debtor support a finding that a TSA was in effect in 2008. Most notable was Mr. Fong's testimony that at the time he joined the Debtor in 2002, the company already had a preexisting written tax sharing agreement with the Bank. At the time the federal regulators in 2005 were conducting an examination of the Bank's financial condition, Mr. Fong changed the existing tax sharing agreement between the Bank and the Debtor into a policy by changing the title of the document from an "agreement" to a "policy". Defendant's Stipulated Exhibit C referred to this as the "Affiliate Transaction Policy" which the regulators found not to be an acceptable tax sharing agreement. As such, the regulators required that the tax sharing arrangement between the Debtor and the Bank be in the form of an agreement. To be in compliance, Mr. Fong testified that he changed the title back to an agreement which became the 2005 TSA that the regulators then deemed acceptable. Mr. Fong further testified that the body of the 2005 TSA contained verbatim the

6

language used in the tax sharing agreement that existed when he joined the Debtor and the Bank. Defendant's Stipulated Exhibit C further stated that the federal regulators encouraged the Bank's management to review the TSA to incorporate, at a minimum, the recommendations outlined in the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure dated November 23, 1998 ("Interagency Policy Statement"). (Def. Stipulated Exs. C and B.)

The TSA was then approved by the Bank's and the Debtor's boards of directors in 2005. Mr. Fong further testified that in 2006 and 2007, he and Mr. Morales signed the same TSA to satisfy the regulators. However, the boards of the Debtor and the Bank neither approved nor disapproved the subsequent TSAs because, as Mr. Morales testified, board approval was unnecessary unless the boards were implementing a new policy. The TSA was considered to continue as the standard operating procedure for an indefinite period of time until modified or terminated. As a result, no board approval in 2006 and 2007 was required. Indeed, the TSA contained no termination date or expiration date and the boards did not discuss a termination date for the TSA at the meeting in 2005. There was no requirement to approve the TSA and sign the document yearly absent a statement that an annual review and approval was required for a company policy. This was corroborated by similar testimony from Mr. LeSieur. Mr. LeSieur further testified that there was no requirement from a board to reexecute the same TSA every year and no director sought to terminate or amend the existing TSA. Indeed, Mr. Pelgrim testified he had no opinion as to why the TSA had to be signed three years in a row.

In explaining why a TSA was signed in 2006 and 2007, Mr. Morales testified that Mr. Fong was a detailed and pragmatic person; hence, while unnecessary, Mr. Fong had a checklist of regulatory requirements and signed TSAs dated 2006 and 2007 were presented to satisfy the regulators.  In 2008, Mr. Fong testified a 2008 TSA was not signed because the Bank was dealing with more important pressing matters than worrying about a signed TSA.  However, Messrs. Morales and LeSieur believed the same TSA approved in 2005 was in effect in 2008.  Consequently, Mr. LeSieur testified that he understood the same TSA remained in effect for 2008-2009.  He did not see the reexecuted TSAs for 2006 and 2007.  When preparing the 2008 consolidated tax returns, he referred to the same TSA without focusing on the date or doubting its effectiveness.

The Court finds, therefore, that the TSA approved by the two boards in 2005 remained enforceable in 2008 notwithstanding the absence of a signed TSA for that year.  A tax sharing agreement existed at all relevant times between the Bank and the Debtor as memorialized by the TSA that was signed and approved by the boards in 2005.  The Court further finds that the signing of an identical TSA in 2006 and 2007 was a superfluous exercise by Messrs. Fong and Morales in order to remain in compliance with the regulators' requirements.  Defendant's Stipulated Exhibit C did not state that the regulators informed management that the TSA had to be renewed every year but only that management ensure the TSA was comprehensive and that, at a minimum, the recommendations of the Interagency Policy Statement were incorporated in the TSA.

**B.  The terms of the Tax Sharing Agreement established a creditor-debtor relationship.**

This Court has ruled in its MOD that the terms of the TSA were not vague. The four corners of the TSA determine the relationship established by its terms.

The TSA provides that the Bank and the Debtor shall settle intercompany taxes receivable/payable arising from the estimated tax remittances made on a quarterly basis in the amount not to exceed the Bank's entitlement to a refund if it were to file a separate tax return. (Pl. Stipulated Exs. 2, 4 and 5 and Def. Stipulated Ex. A.) The TSA further provides that pursuant to this "true up", the Bank would be entitled to "receive" a refund equal to the amount it would have received regardless if the consolidated group obtained a refund. *Id*. The language of the TSA that refers to "intercompany tax receivable/payable" establishes an obligation of the Debtor to pay the Bank any amount owing based on the accounting framework set forth in the TSA equal to the amount of the refund the Bank would have received if it had filed its own tax return.

The Court rejects Defendant's position that the terms of the TSA created an agency relationship or a trust relationship between the parties and finds the TSA established a creditor-debtor relationship. Most telling of a creditor-debtor relationship is the language in the TSA that entitles the Bank to payment even if the consolidated group did not receive a refund so long as it would have received a refund if the Bank had filed a separate tax return. Under this requirement, the Debtor would have owed the Bank sums it did not receive from the IRS if the Bank were entitled to receive a refund based on a separate return. This is indicative of a debtor-

creditor relationship because it established the Debtor's obligation irrespective of whether a refund was obtained. No trust or agency relationship was created because no "*res*" existed that belonged to the Bank under this circumstance. The Debtor will owe the Bank so long as the Bank was entitled to a refund if the Bank had filed its own tax return.

Additionally, the TSA simply required the Debtor to make a payment to the Bank after a quarterly "true up". The TSA did not state unequivocally that the Debtor serves as an agent for the Bank for purposes of collecting any tax refund. Nor did it set forth parameters that are consistent with a trust agreement. There was no requirement to segregate funds belonging to the Bank, no restriction on how the Debtor could use the funds, no identification of a trust *res*, and no express declaration of the intent to create a trust or to hold the tax refunds in trust for the benefit of the Bank, the consolidated group or anyone else. The TSA simply did not set limitations or controls over the use of the funds obtained from the IRS that were in Debtor's possession including any fixed deadline when the funds were to be paid to the Bank.

Instead, the terms "receivable" and "payable" in the agreement and the requirement to pay the Bank its refund even if the consolidated group did not receive a tax refund evidenced the intent to create an obligation to the Bank in the form of a reimbursement thereby establishing a debtor-creditor relationship. The Court finds further that while the TSA was not a loan agreement or a promissory note, its terms nevertheless established Debtor's payment obligation to the Bank for any tax refund to which the Bank was entitled. This fungible obligation negates a finding that the Bank

10

had an ownership right to the tax refunds.  Accordingly, this Court finds the terms of the TSA that were operative in 2008 evidence a debtor-creditor relationship whereby the Debtor was obligated to pay the Bank for any tax refund due to the Bank.

If any of the above findings of fact are subsequently determined to be conclusions of law, they shall be deemed to be so designated.

**CONCLUSIONS OF LAW**

Because an operative TSA was in effect in 2008, this Court cannot reach the same holding as *Bob Richards*' rendering it inapplicable in this case.  The Ninth Circuit's decision in *Bob Richards* advanced the principle that, "absent any differing agreement, . . . a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member." *Id*. at 265.  The terms of the TSA, which this Court finds unambiguous, control the relationship of the parties in this case.  When parties have elected to put an agreement in writing, the unambiguous words of the agreement control, and their actual intent is ineffective. *See In re Nelco, Ltd.*, 264 B.R. 790, 806-07 (Bankr. E.D. Va. 1999).

In concluding that the TSA establishes a creditor-debtor relationship, this Court finds the Eleventh Circuit decisions in *In re NetBank, Inc.*, 729 F.3d 1344 (11th Cir. 2013), and *In re BankUnited Fin. Corp.*, 727 F.3d 1100 (11th Cir. 2013), distinguishable and its decisions do not bind this Court.  While this Court previously cited to the lower courts' decisions in *BankUnited* and *NetBank* in its MOD,

the reversal of those decisions does not impact the conclusion reached here.

For instance, in *NetBank*, the parent company had sole responsibility for filing tax returns, and electing gains, losses, deductions and credits on behalf of the consolidated group. 729 F.3d at 1347-48. Section §9 of the *NetBank* agreement expressly stated "[e]ach Affiliate hereby irrevocably appoints NetBank as its agent and attorney in fact. . ." The *NetBank* TSA further stated in § 10 the intent to allocate the tax liability in accordance with the Interagency Policy Statement that establishes an agency relationship. *Id*. at 1348. Unlike *NetBank*, the Debtor's TSA did not include express agency language such as that found in NetBank's tax sharing agreement.

At the same time, the Eleventh Circuit found NetBank's agreement to be ambiguous because it included express agency language and the intention to comply with the Interagency Policy Statement while also including language that established the parent's independent contractual obligation to pay the subsidiary bank. 729 F.3d at 1349. Here, the Debtor's TSA is unambiguous. The language of the TSA clearly demonstrates an obligation to pay the Bank for refunds it is due. The TSA does not refer to an agency relationship and does not clearly express the intent of the parties to comply with the Interagency Policy Statement.

Lastly, the Eleventh Circuit found that § 10 of NetBank's TSA explicitly stated that the tax settlements between the parties "should result in no less favorable treatment to the affiliated group than if it had filed its income tax return as a separate entity" pursuant to the Interagency Policy Statement. 729 F.3d at

1350. Requiring the subsidiary bank to seek payment as an unsecured creditor from the bankruptcy estate of NetBank would be a less favorable treatment because the Interagency Policy Statement contains specific language that the parent serves as an agent on behalf of the consolidated group. *Id.* Unlike *NetBank,* the TSA is simply silent on this point. Determining the Debtor to be the owner of the refund when the TSA lacked express language of an agency relationship does not diminish the Bank's entitlement to an amount equal to its own refund.

The Eleventh Circuit's decision in *BankUnited* is equally distinguishable. In *BankUnited,* the subsidiary bank was tasked with distributing the tax refunds and collecting the tax liabilities on behalf of the consolidated group which the Eleventh Circuit deemed crucial in determining that an agency relationship existed between the parent and the subsidiary bank. To hold that the refund was owned by the holding company would "frustrate the Bank's ability to discharge its obligation to distribute to the members of the Group the portion of the tax refunds to which they are entitled." *BankUnited*, 727 F.3d at 1108. Thus, the Eleventh Circuit found the parties intended the TSA to require the holding company to forward the tax refunds to the bank on receipt even without the express language to do so. 727 F.3d at 1108.

Unlike *BankUnited*, the Bank is not tasked with the same responsibility of collecting and distributing the tax refunds to the consolidated group. Instead, the parties have a "true up" every quarter to settle intercompany taxes receivable/payable arising from the Bank's estimated tax payments. (Pl. Stipulated Ex. 2 and Def. Stipulated Ex. A.)

As in *NetBank*, the Eleventh Circuit found *BankUnited*'s tax sharing agreement to be ambiguous. This Court, however, has consistently held that the TSA approved in 2005 contains no ambiguity.

In both decisions, the Eleventh Circuit discounted the lower courts' findings that the tax sharing agreements did not contain elements of a trust or an agency relationship, particularly, restrictions on control or use of funds. However, in the Ninth Circuit and in California, the absence of restrictions on the use or the commingling of funds has been found relevant and indicative of a debtor-creditor relationship. *See e.g.*, *In re Coupon Clearing Service, Inc.*, 113 F. 1091, 1099-1102 (9th Cir. 1996) (right to control by the principal is sufficient to find an agency relationship); *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP*, 201 Cal. App. 4th 368, 380 (2011) (citation omitted) (if recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists).

Conversely, the absence of a "fixed interest rate, a fixed maturity date, or the ability to accelerate payment upon default" do not negate finding a creditor-debtor relationship. *Cf. BankUnited*, 727 F.3d at 1108 (lack of fixed interest rate, maturity date or default provision is evidence that no debtor-creditor relationship exists). It simply shows that the TSA is not a loan but that it created a different form of indebtedness under the parties' contract.

Similar to the language used in the tax allocation agreement in *In re IndyMac Bancorp, Inc.*, the TSA referred to "intercompany tax

14

receivable/payable" which established an obligation from the Debtor to pay the Bank what was owed to it based on the parties' accounting procedures if the Bank filed its own tax return. *See Siegel v. FDIC (In re IndyMac Bancorp Inc.)*, 2012 LEXIS 1462 *3-4 (Bankr. C.D. Cal. Mar. 29, 2012) as accepted by *In re IndyMac Bancorp, Inc.*, 2012 LEXIS 88666 *13-17 (C.D. Cal. May 30, 2012).

As in *IndyMac* and *In re Team Financials, Inc.*, 2010 WL 1730681 *3 (Bankr. D. Kan. Apr. 27, 2010), the TSA did not create an express trust as it lacked the necessary language to create such a trust. *See Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1075 (E.D. Cal. 2003) (citation omitted) (voluntary trust created by acts or words of the trustor indicated (1) an intention to create a trust and (2) the subject, purpose, and beneficiary of the trust); *see also In re First Central Financial Corp.*, 377 F.3d 209 (9th Cir. 2004) (no constructive trust was created). The TSA did not identify the Debtor as, and the Debtor did not assent to becoming, a trustee. As this Court found above, the TSA had no requirement to segregate funds belonging to the Bank, no restriction on how the Debtor could use the funds, no identification of a trust *res*, and no express declaration of the intent to create a trust or to hold the tax refunds in trust for the benefit of the consolidated group. Likewise, the TSA did not state unequivocally that the Debtor agreed to serve as an agent for the Bank for purposes of collecting any tax refund. Instead, the terms "receivable" and "payable" evidence the intent to create an obligation to the subsidiary in the form of a reimbursement thereby establishing a debtor-creditor relationship.

*Lubin*, a case cited by the FDIC-R, is consistent with this principle. *Lubin v. FDIC*, 2011 WL 825751 *5 (N.D. Ga. 2011). The bankruptcy court in *Lubin* found that the language of the existing tax allocation agreement expressly provided:

> "If the Holding Company receives a tax refund from a taxing authority, these funds are obtained as agent of the consolidated group on behalf of the individual group members. This allocation agreement as well as other corporate policies should not be intended to consider refunds attributable to the subsidiary banks, which are received by the Holding Company from the taxing authority, as the property of the Holding Company."

*Lubin* found it clear from the language of the tax allocation agreement that an agency relationship was intended. *Id*. at *6. Such is not the case here.

The U.S. Supreme Court's decision in *US Airways, Inc. v. McCutchen,* 133 U.S. 1537 (2013), does not defeat a finding that the terms of the TSA establish a debtor-creditor relationship. *McCutchen's* holding does not support Defendant's position that a TSA must "expressly disavow" a default rule such as *Bob Richards* for *Bob Richards* to be deemed inapplicable. *McCutchen* held that "default rules" applied only in the absence of a clear expression of the parties' intent so that if the express terms of a contract contradict the default rule, the agreement governs. 133 S.Ct. at 1549. Unlike *McCutchen* where the ERISA plan provisions were silent in allocating the costs of obtaining a third-party recovery thereby "leaving space for the common-fund rule to operate", 133 S.Ct. at

1549, the TSA is not vague and contains express provisions that establish a debtor-creditor relationship as explained above.

Similarly, *BSD Bancorp, Inc. v. FDIC (In re BSD Bancorp, Inc.)*, 1995 U.S. Dist. LEXIS 22588 *10 and 14 (S.D. Cal. Feb. 28, 1995), is distinguishable because again, *BSD* found the tax sharing agreement to be vague and that it provided for the parent's immediate reimbursement of the bank's tax refund— aspects which are not present in the 2005 TSA. *BSD* court held the terms of the agreement must expressly or impliedly override the gap-filling (default) rule itself. *Id*. at *13. Here, there is no gap as the TSA is unambiguous and the provisions of the TSA create a fungible obligation to pay the Bank its refund even if the consolidated group does not receive a refund thereby creating a debt independent of a *res*.

The unambiguous terms of the TSA and the holdings of these cases coalesce into the conclusion that the TSA overrides the holding in *Bob Richards* that a principal-agent relationship is established by the filing of a consolidated tax return. This Court holds that the TSA created a debtor-creditor relationship whereby the Debtor owes the Bank sums equal to the amount of the refunds the Bank would have received if it had filed its own separate tax return.

The Court rejects the FDIC-R's position that the Interagency Policy Statement must be given significant weight. The TSA is clear and extrinsic evidence need not be considered. Moreover, the District Court in *Siegel v. FDIC*, 20012 U.S. Dist. LEXIS 78418 *11 (C.D. Cal. 2011), found that the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, 63 Fed. Reg.

64757, is a non-binding policy statement and is not material to adjudicate ownership of the refund.

*Team Financial* reached the same finding that nothing in the Interagency Policy Statement renders it legally binding or has the force of law. 2010 WL1730681 *8. Furthermore, the Court agrees with *Team Financial* that the use of "agency" in the Statement refers to Treas. Reg. § 1.1502-77(a), the main purpose of which is to set the ground rules for how the IRS would deal with consolidated tax groups filing consolidated returns. 2010 WL 1730681 *6. The tax regulation requires the parent to act as the sole agent to handle all matters relating to the tax return.

However, these regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government. *Bob Richards*, 473 F.2d at 265. The Court finds irrelevant that the estate, instead of the Bank, received the tax refunds directly from the IRS. The Treasury Regulation requires that the tax refund be paid to the entity that filed the claim. 26 C.F.R. § 1.1502-77(a)(2)(v). The IRS is not concerned with the subsequent disposition of tax refunds and none of its regulations must be construed to govern this issue. *Bob Richards*, 472 F.2d at 265; *IndyMac*, 2011 LEXIS 78418 *12-13 citing *In re First Cent. Fin. Corp.*, 269 B.R. 481, 489 (E.D.N.Y. 2001), *aff'd*, *Superintend. of Ins. v. Ochs*, 377 F.3d 209 (2d Cir. 2004). Nothing in the Internal Revenue Code or the regulations promulgated thereunder purports to determine the relative rights of the members of a consolidated group of companies with respect to tax refunds. Therefore, this Court is unwilling to be bound by the Interagency Policy Statement.

Likewise, this Court finds the rejection of the TSA by operation of the Debtor's confirmed plan did not extinguish the TSA. Rejection of an executory contract results in a breach of such contract but does not affect the substantive rights of the parties under the rejected contract that was established at the time the bankruptcy petition was filed. *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 673 (9th Cir. 2007).

If any of the above conclusions of law are subsequently determined to be findings of fact, they shall be so designated.

**CONCLUSION**

For the reasons stated herein, the Court finds in favor of the Plaintiff on Count IV of the Complaint and against the Defendant on Count I of the Amended Counterclaim. The Debtor is entitled to the tax refunds in question and the Defendant is entitled to a general unsecured claim against the Debtor's estate. A separate judgment resolving all issues raised by the Complaint will be entered against the Defendant upon the complete resolution of this proceeding.

###

Date: March 28, 2014

Richard M. Neiter
United States Bankruptcy Judge